2002 WY 168

**In the Matter of the Termination of Parental Rights to SED, Jr., minor child.**

**SD, Appellant, (Respondent),**

v.

**CARBON COUNTY DEPARTMENT OF FAMILY SERVICES, Appellee (Petitioner).**

**In the Matter of the Termination of Parental Rights to SED, Jr., minor child.**

**TD, Appellant (Respondent),**

v.

**Carbon County Department of Family Services, Appellee (Petitioner).**

Nos. C–02–3, C–02–4.

Supreme Court of Wyoming.

Nov. 19, 2002.

David C. Clark, Rawlins, WY; and P.M. "Mike" Roberts of Erickson and Roberts, Rawlins, WY, Representing Appellants. Argument by Mr. Clark.

Hoke MacMillan, Attorney General; Michael L. Hubbard, Deputy Attorney General; and Dan S. Wilde, Senior Assistant Attorney General, Representing Appellee. Argument by Mr. Wilde.

Before HILL, C.J., and GOLDEN, LEHMAN, and VOIGT, JJ., and SANDERSON, D.J.

LEHMAN, Justice.

[¶ 1] The parents of SED, Jr., a minor child (Minor Child), appeal the district court order terminating their parental rights. In this consolidated appeal, both parents claim that the court erred when it found clear and convincing evidence upon which to terminate their parental rights. We find clear and convincing evidence to support the district court's order and accordingly affirm.

## ISSUE

[¶ 2] Appellants assert eight issues on appeal. All eight issues challenge the facts as found by the district court. We therefore view the issue as:

Was the district court's finding that parental rights to Minor Child should be terminated established by clear and convincing evidence?

## FACTS

[¶ 3] Minor Child was born on March 16, 1996. Prior to his birth, the Carbon County Public Health Nursing Agency (Public Health) and the Department of Family Services (DFS) began various programs with his parents due to concern over the parents' ability to care for a child. These programs included nutritional support, health care, budgeting instruction, and housekeeping instruction. The services continued after Minor Child's birth in an effort to provide a safe and healthy environment for the child. How-

ever, Minor Child was removed from his parent's home in March of 1997, immediately before his first birthday. Minor Child has remained in foster care since that time.

[¶ 4] A petition to terminate parental rights was filed on February 8, 2001. In October of 2001, a three-day trial was held on the petition. At the time of trial, Minor Child was five years of age. On November 16, 2001, the district court granted the petition and ordered the parental rights to Minor Child terminated.[1]

## STANDARD OF REVIEW

[¶ 5] When setting forth our standard of review for the granting of a petition to terminate parental rights we have said:

Due to the tension between the fundamental liberty of familial association and the compelling state interest in protecting the welfare of children, application of statutes for termination of parental rights is a matter for strict scrutiny. *TR v. Washakie County Dep't of Pub. Assistance & Soc. Servs.*, 736 P.2d 712, 715 (Wyo.1987). As part of this strict scrutiny standard, a case for termination of parental rights must be established by clear and convincing evidence. Wyo. Stat. Ann. § 14–2–309(a) (Michie 1997); *In Interest of JG*, 742 P.2d 770, 773 (Wyo.1987); *D.S. v. Dep't of Pub. Assistance & Soc. Servs.*, 607 P.2d 911, 919 (Wyo.1980). Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of the contention is highly probable. *Matter of GP*, 679 P.2d 976, 982 (Wyo.1984). Rigorous though this standard may be, we apply our traditional principles of evidentiary review when a party challenges the sufficiency of the evidence supporting termination. *Matter of SYM*, 924 P.2d 985, 987 (Wyo.1996). Thus, we examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party. *Id; D.S. v. Dep't of Pub. Assistance & Soc. Servs.*, 607 P.2d at 919–20; *In Interest of JG*, 742 P.2d at 773.

---

1. Because the issues raised by the parents are essentially challenges to the factual findings of the trial court, further facts will be included in the body of this opinion.

*In Re ZKP,* 979 P.2d 953, 956 (Wyo.1999). See also *In re IH,* 2001 WY 100, 33 P.3d 172 (Wyo.2001); *Matter of TLC,* 2002 WY 76, 46 P.3d 863 (Wyo.2002).

### DISCUSSION

[¶ 6] The State's petition for termination of parental rights requested termination be ordered based on three separate grounds. The allegations in support of these grounds rested upon Wyo. Stat. Ann. §§ 14–2–309(a)(i), 14–2–309(a)(iii), and 14–2–309(a)(v) (LexisNexis 2001). Although parental rights may be terminated on a finding of just one of the above-stated subsections, the district court found clear and convincing evidence to support termination on all three grounds. We agree and will discuss each subsection in turn.

**Wyo. Stat. Ann. § 14–2–309(a)(i)**

[¶ 7] We begin with Wyo. Stat. Ann. § 14–2–309(a)(i) which allows the parent-child legal relationship to be terminated if "[t]he child has been left in the care of another person without provision for the child's support and without communication from the absent parent for a period of at least one (1) year." In this case, the issue is not whether the parents contributed to the support of Minor Child as the record indicates that they did not; rather the issue focuses on lack of communication. The parents claim the failure to maintain contact with the minor child was not a result of their actions, but instead they were denied and discouraged from visitation. The facts appear contrary to their assertions.

[¶ 8] The first foster home for the child was located in Rawlins, Wyoming, the same town in which the parents lived. According to the notice of visitation plan, visitation was to occur twice weekly, once with the foster mother and once at Project Reach.[2] The foster mother's testimony showed the parents cancelled most of the visitations scheduled with her. Ms. Thompson, from Project Reach, testified the parents attended the Project Reach class with Minor Child only one or two times. The DFS social worker in charge of the case testified that in

the first year in which visitation was to occur twice weekly, the parents visited Minor Child between eight and ten times.

[¶ 9] Approximately one year and two months after Minor Child was removed from the parents' home, the parents moved from Rawlins to Cheyenne, Wyoming. DFS advised the parents such a move would make visitation considerably more difficult. The parents moved anyway. DFS tried to arrange transportation for the parents to come to Rawlins and visit, but the family chose not to take advantage of those visitations. Furthermore, not only was there no physical visitation, but there was no communication through telephone calls, cards, or letters either. From the record, it appears the last visitation with Minor Child was just before the parents left for Cheyenne over three years prior to the termination hearing.

[¶ 10] In June of 2000, Minor Child was placed in a second foster home. This foster home was located in Cheyenne, with the intent to arrange and facilitate visitation with the parents. However, visitation still did not occur. Testimony indicated the parents requested visitation immediately after Minor Child's move to Cheyenne. DFS asked for additional time to get Minor Child adjusted to his new home before visitation began. At that time, Minor Child suffered from severe separation anxiety. When visitation did not occur immediately as requested, the parents quit asking. After that, no arrangement could be made for visitation because of the unstable living environment of the parents. The parents also point to an incident in December of 1998, when the parents requested that the child be brought to Cheyenne for Christmas. The foster mother could not take Minor Child to Cheyenne at that time so visitation did not occur. These instances do not amount to the denial of visitation. With the few exceptions provided above, lack of visitation was a direct result of the parents' own actions. Therefore, on these facts, we find the requirements of § 14–2–309(a)(i) are shown by clear and convincing evidence.

2. Project Reach is a program that screens and evaluates motor skills, language skills, and speech. The program also helps parents learn

how to interact, stimulate, and provide therapy to developmentally challenged toddlers.

## Wyo. Stat. Ann § 14–2–309(a)(iii)

[¶ 11] The second ground for termination found by the district court is § 14–2–309(a)(iii).[3] Termination of parental rights pursuant to this section requires the petitioner to establish by clear and convincing evidence three elements: 1) abuse or neglect by the parents; 2) unsuccessful reasonable efforts to rehabilitate the family; and 3) the child's health and safety are seriously jeopardized by remaining with or returning to the parents. *In Re ZKP*, 979 P.2d at 957 (citing *Matter of SYM*, 924 P.2d 985, 987 (Wyo. 1996)). We consider the elements in turn.

[¶ 12] The petition does not contain allegations of abuse so we focus our discussion on neglect. "Neglect" means "a failure or refusal by those responsible for the child's welfare to provide adequate care, maintenance, supervision, education or medical, surgical or any other care necessary for the child's well being." Wyo. Stat. Ann. § 14–3–202(a)(vii) (LexisNexis 2001).

[¶ 13] While under the care of his parents, Minor Child was significantly developmentally delayed. His gross motor skills were in the first percentile, and his fine motor skills were in the second percentile. These developmental delays were attributed to the parents' failure to provide a nurturing or stimulating environment. Testimony revealed that social workers never saw the parents or extended family interact with the child, the house was so cluttered and filthy that the child could not roll over if placed on the floor, and the child was constantly observed in his stroller. At the age of one, the child could not hold up his own head, could not crawl, could not talk, and did not know how to use his fingers. Furthermore, after a period of placement in foster care, Minor Child improved dramatically. His gross motor skills improved to the seventieth percentile and his fine motor skills increased to the fifty-second percentile. Hence, it is reasonable to conclude that the developmental deficiencies displayed by Minor Child were the result of neglect by his parents.

[¶ 14] Testimony showed that the parents did not provide Minor Child with proper nourishment. The parents gave Minor Child half-strength formula despite being told repeatedly that infants need whole strength formula to provide the nourishment critical for brain development and despite being shown numerous times how to properly mix the formula. The parents continually gave Minor Child Kool–Aid at two months of age after being advised that Kool–Aid was not appropriate for a child that age. Against the advice of doctors and numerous service providers, the parents also fed the child solid foods at six months of age resulting in hospitalization and digestive problems.

[¶ 15] Furthermore, Minor Child was diagnosed with ear infections for which antibiotics were prescribed. The parents failed to fill the prescription, and Minor Child went untreated for three days after diagnosis. Minor Child was diagnosed with asthma. The parents were repeatedly cautioned not to smoke around Minor Child because the smoke would aggravate his condition. However, the parents continued to smoke around Minor Child. These instances are adequate to show a failure to provide adequate care necessary for Minor Child's well being, thus neglect.

[¶ 16] We now turn to the second element, unsuccessful reasonable attempts to rehabilitate the family. When family reunification is the case plan goal, DFS has the responsibility reasonably to provide the services necessary to accomplish the specific goals and tasks called for before reunification can occur. *MB v. Laramie County Dep't of Family Servs. in Interest of LB*, 933 P.2d 1126, 1129–30 (Wyo.1997). The record is filled with instances of DFS meeting this responsibility. A summary indicates a community-wide response by nearly every available resource made up of individuals committed to family reunification. Services began months before the birth of Minor Child and continued to be provided. The organizations providing services to this family include soup

---

3. Wyo. Stat. Ann. § 14–2–309(a)(iii) reads:
   The child has been abused or neglected by the parent and reasonable efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent[.]

kitchen, faith-based services, DFS, Public Health, Carbon County Extension Office, Project Reach, Carbon County Counseling, Southeast Mental Health, Needs, Inc., and the Department of Vocational Rehabilitation.

[¶ 17] Public Health was first assigned to work with the parents when the mother was seven weeks pregnant with Minor Child. While providing pre-natal care, the nurses became concerned that the parents' home was an unsafe environment for a newborn as the home had no heat or hot water, there was garbage everywhere, and the parents were out of food in the middle of the month. This concern led the nurses to make a referral to DFS. DFS took immediate action even cleaning the parents' house before the Minor Child was brought home from the hospital.

[¶ 18] After Minor Child was born, DFS provided daily visits trying to teach the parents nutrition, scheduling, budgeting, and housekeeping. Public Health continued to conduct weekly home visits focusing on the child's health. The nurses concentrated on teaching the mother how to care for a newborn child. They focused on nutrition for the baby, teaching the mother how to mix formula for the child. Even though the mother would say that she understood how to mix the formula, and would show the nurse how to do it, on follow-up visits, she would be mixing the formula at half strength again.

[¶ 19] The parents claim the instructions and the case plan goals were too complicated, and they were unable to understand them. Yet, the evidence presented at trial describes how the agencies all utilized simplistic incremental steps in teaching the parents. For instance, Lori Olson, a DFS home service aid, was in the home almost every day for three months going over and over cooking and nutrition. Testimony at trial detailed the extensive attempts made to equip these parents with the skills they needed to effectively raise their child. Nevertheless, the parents seemed to resist the rehabilitative efforts. Depending on the service, they missed thirty to fifty percent of their pre-set appointments. While Minor Child was in the home, the parents made no significant progress and failed to follow through with most of the programs.

[¶ 20] After Minor Child had been removed from the home, both parents submitted to psychological evaluations, which revealed the mother as possessing borderline intellectual functioning, and the father only slightly higher. Specifically, the mother was evaluated as being overwhelmed by trying to accomplish multiple goals at one time. While those facts were not presented by the State as a basis for termination, the parents rely upon them to show that there was no refusal of rehabilitative treatment, but rather an inability to understand the demands made by the State in the case plan for family reunification.

[¶ 21] Yet, after this evaluation, the record is full of further instances of teaching in incremental steps, one task at a time. The lengths to which the service providers went to assist the parents in achieving the case plan goals indicates the use of every feasible education approach to teach the parents in elementary steps. Attempts were made to instruct this family over five years on a weekly, and at times daily, basis. The case plan had eleven headings, but the goals related to each heading were never worked on all at once. These eleven headings included very specific elementary steps like enroll and attend parenting classes, enroll and attend counseling, find a preschool for Minor Child, and arrange transportation. Furthermore, the mother testified that some of these tasks the parents already knew how to do.

[¶ 22] The psychological evaluation further indicated that with the proper monitoring both parents could learn parenting skills over time if *motivated, interested, and willing to take the time to learn.* But the parents placed no importance on learning or implementing the tasks required to provide a safe environment for their son. They seemed non-cooperative and resistant to all efforts. For instance, when learning how to clean their house, they would just sit and watch the in-home aid clean. They never cleaned for themselves even though they understood how. When the in-home aid returned the next time, the house would be worse than before. The mother even stated that DFS has a stack of files on the parent's lack of effort.

[¶ 23] We don't know of any other approach that could have been utilized. There is a limit to what we ask of DFS in the absence of parental cooperation. We have previously recognized that at some point rehabilitative efforts become unreasonable. "[I]t would seem unreasonable and not for the best interests of the child that professional welfare workers should be furnished to care for this child in the parental home on a twenty-four-hour basis for the many years until the child herself can be self-sufficient." *Matter of C.M.*, 556 P.2d 514, 519 (Wyo. 1976). The record indicates that the parents, even after four years of training, instruction, and supervision, would not be able to care for the child without further instruction. We are not penalizing the parents for lack of mental capacity, we are simply considering the best interests and welfare of the child. *Id.*, at 517. The parents have failed to take advantage of the services provided to them, failed to meaningfully participate in the case plan, and failed to implement what they have learned. Thus, we find the evidence was clear and convincing that the reasonable rehabilitative efforts were unsuccessful.

[¶ 24] Finally, we consider the last element of § 14–2–309(a)(iii), that the child's health and safety would be seriously jeopardized should he be returned to the parents' custody. The parents, after all this time, show no willingness to respond to the needs of their child. They are unable to consistently provide appropriate housing, food, clothing, and medical treatment. They believe the lifestyle they provided in the first year of Minor Child's life is a proper environment. This lifestyle was described at trial as "survival mode," and it remains substantially the same. The parents have no stable home or consistent environment and seem to depend on public assistance for their own basic living essentials. They require intensive external resources in the home to maintain a safe environment for the child; but, as discussed above, those have failed.

[¶ 25] The State provided evidence to show the parents incapable of properly caring for their child. Dr. Martha Schilling, a psychologist who evaluated the parents in the spring of 1997, testified: "I did not think that there was a very good prognosis for the couple together being able to provide a safe environment." She further stated that the parents do not have the stability to care for Minor Child and it would be detrimental to him to leave his foster home to live with total strangers. We find clear and convincing evidence to show this final element.

**Wyo. Stat. Ann. § 14–2–309(a)(v)**

[¶ 26] The last ground alleged in the petition is § 14–2–309(a)(v), "[t]he child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months, and a showing that the parent is unfit to have custody and control of the child[.]" At the time of trial, Minor Child had been in foster care for forty-two continuous months. As we indicated above, the evidence showed that the parents were unfit to have custody or control of Minor Child. We find this ground for termination was also proved by clear and convincing evidence.

[¶ 27] We are not unsympathetic to the disabilities and hardships of the parents. However, this case demonstrates a situation in which the best interest of the child and the fundamental rights of the parents diverge. While we zealously guard the fundamental right of parents to care for and associate with their children, we also recognize that a child has the fundamental right to live in an environment free from filth, health hazards, and danger; he also has the right to nourishment, education, and necessary medical attention. *Matter of MLM*, 682 P.2d 982, 990 (Wyo.1984). "When the rights of a parent and the rights of a child are on a collision course, the rights of the parent must yield." *Id.*

### CONCLUSION

[¶ 28] For the reasons stated above we find that there was clear and convincing evidence presented to support the termination of parental rights. We, therefore, affirm the judgment of the district court.