2012 WY 150

**In the Matter of the Termination of Parental Rights to KAT, SAT, and JGS, Minor Children,**

**NLT, Appellant (Respondent),**

v.

**The State of Wyoming, Department of Family Services, Appellee (Petitioner).**

**In the Matter of the Termination of Parental Rights to JGS, Minor Child, MDS, Appellant (Respondent),**

v.

**The State of Wyoming, Department of Family Services, Appellee (Petitioner).**

Nos. S–12–0068, S–12–0069.

Supreme Court of Wyoming.

Nov. 28, 2012.

Representing Appellant in Case No. S–12–0068: Mary L. Scheible of Scheible Law Office, Thermopolis, Wyoming.

Representing Appellee in Case No. S–12–0068: Gregory A. Phillips, Wyoming Attor-

ney General; Robin Sessions Cooley, Deputy Attorney General; Jill E. Kucera, Senior Assistant Attorney General. Argument by Ms. Kucera.

Guardian Ad Litem in Case No. S–12–0068: Bobbi D. Overfield of Messenger & Overfield, P.C., Thermopolis, Wyoming.

Representing Appellant in Case No. S–12–0069: Christopher J. King of Worrall & Greear, P.C., Worland, Wyoming.

Representing Appellee in Case No. S–12–0069: Gregory A. Phillips, Wyoming Attorney General; Robin Sessions Cooley, Deputy Attorney General; Jill E. Kucera, Senior Assistant Attorney General; Christina F. McCabe, Assistant Attorney General. Argument by Ms. McCabe.

Guardian Ad Litem in Case No. S–12–0069: Bobbi D. Overfield of Messenger & Overfield, P.C., Thermopolis, Wyoming.

Before KITE, C.J., and GOLDEN,* HILL, VOIGT, and BURKE, JJ.

VOIGT, Justice.

[¶ 1]    This opinion encompasses two separate cases that have been consolidated for the purpose of decision.  NLT, who is one of the appellants in this matter, is the mother of KAT, SAT, and JGS. The other appellant, MDS, is the father of JGS. Following a five-day bench trial, the district court terminated NLT's and MDS's parental rights to the minor children.  Both parents appealed, claiming that the Department of Family Services (DFS) failed to provide clear and convincing evidence that their parental rights should be terminated.  We affirm the district court's decision.

## ISSUES

[¶ 2]    1.  Did DFS present clear and convincing evidence to support the district court's decision to terminate NLT's parental rights to KAT, SAT, and JGS?

2.  Did DFS present clear and convincing evidence to support the district court's decision to terminate MDS's parental rights to JGS?

* *Justice Golden retired effective September 30, 2012.*

## FACTS

[¶ 3]    When she was 17 years old, NLT married CRT, a 45-year-old convicted sex offender.  Although NLT knew that her new husband had been convicted of sexually assaulting his son from a previous relationship, she believed that he "had learned his lesson." The couple lived in what can only be described as squalor, and, after seven years of marriage, the couple's first child, KAT, was born on December 13, 2000.  Thereafter, a son, CT, was born [1].  NLT believed her relationship with CRT was good until after the children were born.  At that point, CRT became abusive towards NLT and the children.  When KAT was approximately two years old, NLT removed KAT's diaper and held her down while CRT sexually abused the child.  Approximately a year after that event, NLT left the home with the children and, with the help of the Hope Agency, obtained a restraining order against CRT.

[¶ 4]    Although they were separated and the restraining order had been issued, CRT continued to visit NLT and the children and would often stay the night at their apartment.  NLT then became pregnant with their third child.  NLT moved with her children to Riverton, but returned to Torrington and again lived with CRT. Their third child, SAT, was born on November 1, 2005.  Thereafter, NLT divorced CRT and moved with the children back to Riverton.

[¶ 5]    NLT began dating MDS and in April 2007, after becoming pregnant with his child, she moved her family to Thermopolis to live with him.  That summer, KAT, CT, and SAT stayed with their father, CRT, for three weeks in Torrington.  NLT was concerned about the children when they returned from the visit because the children were all having a difficult time using the bathroom and SAT had a yeast infection. NLT took the children to the doctor and the problems were resolved.  NLT's and MDS's child, JGS, was born on October 2, 2007.

1.    DFS has not sought to terminate NLT's parental rights to CT because CT was not living in the home at the time the petition was filed.

[¶ 6]  After JGS was born, KAT disclosed to her mother that her uncle, GT, had touched her inappropriately while she was staying with her father the previous summer. NLT told MDS about KAT's allegations, and MDS advised NLT that she ought not report the abuse because DFS would take the children away.  Although NLT was concerned that her children would be taken away, she reported the abuse to the Hope Agency. The DFS office in Torrington was notified of the allegations, but no action was taken or criminal charges filed.

[¶ 7]  In 2008, DFS had two more contacts with the family: one regarding a report of SAT being left alone outside in inappropriate dress for winter and the other after a report of excessive punishment.  In response to those reports, DFS offered parenting classes for the family and counseling services for KAT. NLT and MDS agreed to the parenting classes, but declined counseling for KAT. During this time, CT was no longer living with NLT and MDS. According to NLT, MDS and CT were not getting along and, thus, MDS suggested that CT live with CRT. This suggestion was made even though NLT and MDS both believed that CRT had been molesting CT. Although service providers helping the family at the time warned that it was not a good idea to send CT to live with CRT, NLT ultimately agreed to do so because she was afraid that MDS would otherwise make her leave the home.

[¶ 8]  When service providers came to the home to assist NLT and MDS, they often observed inappropriate behavior, usually from MDS. MDS made threatening comments towards the providers and was belittling of NLT in front of others.  One provider reported the behavior to her agency's attorney, who felt it was no longer safe for that provider to go to the home.  With other providers, MDS generally left the room when parenting skills were discussed, and neither MDS nor NLT "model[ed]" the techniques the providers were using with the children.

[¶ 9]  In January 2009, NLT called her social service aide at DFS to apologize for missing a parenting session earlier in the day.  During the conversation, NLT told the social service aide about the incident wherein NLT assisted CRT in sexually abusing KAT. NLT explained that MDS told her he had a tape recording of her disclosing the abuse of KAT to MDS, and that he was going to give the tape to DFS. The social service aide contacted her supervisor and law enforcement.  NLT then repeated what she and CRT had done to KAT to Officer McDonald of the Thermopolis Police Department. Officer McDonald discussed the situation with DFS, the police chief, and the county attorney, and it was decided that NLT's children needed to be taken into protective custody.

[¶ 10]  The Hot Springs County Attorney filed a neglect petition against NLT on February 3, 2009, and a shelter care hearing was held the same day.  The juvenile court ordered that KAT and SAT remain in DFS custody for foster care placement, and that JGS be returned to MDS. On February 10, 2009, DFS took KAT to the Children's Advocacy Project for a forensic interview.  In that interview, KAT disclosed that she had been sexually abused by her father, CRT, and her uncle, GT. She also disclosed that MDS had sexually abused her, anally raped her, and made her view pornography.  Thereafter, MDS was arrested and JGS was placed in protective custody.  The county attorney then filed a neglect petition against NLT and MDS on February 13, 2009.

[¶ 11]  DFS developed case plans for both NLT and MDS, with the permanency goal of reunification with the children.  NLT's case plan goals were to establish a safe home for the children without financial support from MDS, attend counseling and address treatment needs, obtain a psychosexual and psychological evaluation, take random drug and alcohol tests, and attend regular visitation with the children.  MDS's case plan goals were to attend counseling, obtain a psychosexual evaluation, a substance abuse evaluation, a domestic violence and anger management evaluation, maintain consistent housing and employment, and visitation with JGS.

[¶ 12]  Over the next several months, a multidisciplinary team regularly met to evaluate NLT's and MDS's progress in their case plans.  MDS failed to comply with any part of his case plan other than visitation, and NLT failed to make attempts to gain employ-

ment or housing. During this time, MDS was convicted of two counts of first-degree sexual assault for his conduct with KAT and was sentenced to serve two consecutive terms of 20 to 35 years in prison. Also during this time, the juvenile court found that the allegations against NLT and MDS in each of the petitions were true. On November 16, 2009, the multidisciplinary team recommended that the permanency goal of NLT's and MDS's case plans be changed from reunification to termination of parental rights. The juvenile court ordered that termination be the new goal, and DFS prepared new case plans which reflected that goal.

[¶ 13] On August 31, 2010, DFS filed a petition to terminate NLT's parental rights to KAT, SAT, and JGS pursuant to Wyo. Stat. Ann. § 14–2–309(a)(iii) and (v) (Lexis Nexis 2011) and MDS's parental rights to JGS pursuant to Wyo. Stat. Ann. § 14–2–309(a)(iii), (iv), and (v).[2] The district court held a five-day bench trial in June 2011, where all parties presented witnesses and exhibits. Thereafter, the district court found clear and convincing evidence of each allegation in the petition, and granted the petition to terminate NLT's parental rights to KAT, SAT, and JGS, and the petition to terminate MDS's parental rights to JGS.

## STANDARD OF REVIEW

[¶ 14] In their appeals, NLT and MDS both claim that DFS failed to present clear and convincing evidence that supports the district court's decision to terminate their parental rights. We use our traditional sufficiency of the evidence standard of review when considering whether sufficient evidence was presented to terminate parental rights:

We examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party. This Court then reviews the supporting evidence to ascertain if it clearly and convincingly satisfies the statutory elements required to support termination. Evidence is clear and convincing if it would persuade a trier of fact that the truth of the contention is highly probable. This Court may examine all of the properly admissible evidence in the record, but we do not reweigh the evidence. In applying our standard of review, we keep in mind that the right to associate with one's family is fundamental and strictly scrutinize petitions to terminate parental rights.

*MSH v. ALH*, 2012 WY 29, ¶ 12, 271 P.3d 983, 986 (Wyo.2012) (quoting *JLW v. CAB (In re WDW)*, 2010 WY 9, ¶ 17, 224 P.3d 14, 19 (Wyo.2010) (internal citations omitted)).

## DISCUSSION

### Termination of NLT's parental rights

[¶ 15] DFS petitioned that NLT's parental rights to KAT, SAT, and JGS be terminated on two grounds. First, DFS sought termination pursuant to Wyo. Stat. Ann. § 14–2–309(a)(iii), which requires DFS to prove by clear and convincing evidence that the children have been abused or neglected by the parent, that DFS has made reasonable efforts to rehabilitate the family, and that the children's health and safety would be seriously jeopardized if returned to the parent. Second, DFS sought termination pursuant to Wyo. Stat. Ann. § 14–2–309(a)(v), which requires DFS to prove by clear and convincing evidence that the chil-

---

2. The relevant portions of Wyo. Stat. Ann. § 14–2–309 state:

(a) The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence:

. . . .

(iii) The child has been abused or neglected by the parent and reasonable efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment, and it is shown that the child's

health and safety would be seriously jeopardized by remaining with or returning to the parent;

(iv) The parent is incarcerated due to the conviction of a felony and a showing that the parent is unfit to have the custody and control of the child;

(v) The child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months, and a showing that the parent is unfit to have custody and control of the child[.]

dren have been in foster care for 15 of the most recent 22 months and that the parent is unfit to have custody and control of the children. NLT claims that DFS failed to prove by clear and convincing evidence any of the requirements of Wyo. Stat. Ann. § 14–2–309(a)(iii) and that DFS failed to prove that she is unfit to have custody and control of her children, as required by Wyo. Stat. Ann. § 14–2–309(a)(v).

[¶ 16] Although DFS requested that NLT's parental rights be terminated pursuant to two separate grounds, and the district court found that both of those grounds had been sufficiently proven, "[p]arental rights may be terminated on a finding of just one" of the stated subsections enunciated in Wyo. Stat. Ann. § 14–2–309. *SD v. Carbon Cnty. Dep't of Family Servs.*, 2002 WY 168, ¶ 6, 57 P.3d 1235, 1238 (Wyo.2002). For that reason, we find it appropriate to affirm the district court's decision to terminate NLT's parental rights so long as one of the bases in Wyo. Stat. Ann. § 14–2–309 has been proven with clear and convincing evidence. We find that DFS did provide clear and convincing evidence to support the district court's finding to terminate NLT's parental rights pursuant to Wyo. Stat. Ann. § 14–2–309(a)(v).

[¶ 17] As mentioned above, Wyo. Stat. Ann. § 14–2–309(a)(v) requires DFS to prove with clear and convincing evidence that the children have been in foster care 15 of the most recent 22 months and that NLT is unfit to have custody and control of the children. NLT does not dispute that the children have been in foster care for 15 of the last 22 months. Therefore, we need only determine whether there was clear and convincing evidence presented that NLT is unfit to have custody and control of the children. We find that DFS met that burden.

[¶ 18] The termination statutes do not define the term "unfit;" however, this Court has determined that "fitness includes the ability to meet the ongoing physical, mental and emotional needs of the child." *R.L.A. v. State, Dep't of Family Servs. (In re L.A.)*, 2009 WY 109, ¶ 14, 215 P.3d 266, 269 (Wyo.2009). Further:

It is well-settled that a parent's fitness is to be determined at the time of the termi-

nation trial. *AJJ v. State (In re KMJ)*, 2010 WY 142, ¶ 17, 242 P.3d 968, 971 (Wyo. 2010). "That does not mean, however, that the district court must ignore evidence of a parent's previous unfitness." *Id.* This Court recently reiterated that "[i]t is appropriate for a district court to consider a parent's history and pattern of behavior over time in determining whether rights should be terminated." *JLW v. CAB (In re WDW)*, 2010 WY 9, ¶ 24, 224 P.3d 14, 20 (Wyo.2010) (citations omitted). Evidence of past behavior is "plainly relevant in determining current parental fitness." *JD v. State (In re AE)*, 2009 WY 78, ¶ 18, 208 P.3d 1323, 1328 (Wyo.2009).

*PRG v. State, Dep't of Family Servs. (In re KMO)*, 2012 WY 100, ¶ 20, 280 P.3d 1216, 1222 (Wyo.2012).

[¶ 19] DFS presented a tremendous amount of evidence at trial demonstrating NLT's past and current inability to meet the ongoing physical, mental, and emotional needs of KAT, SAT, and JGS. When NLT married CRT, and chose to have children with him, she knew that he previously had been convicted of sexually abusing his son from a prior relationship. After the children were born, CRT became abusive, and NLT chose to remain in that relationship for several years. Tragically, NLT also participated in the abuse of, at least, KAT, as she admitted that she removed two-year-old KAT's diaper and held her down by her arms and legs so that CRT could sexually abuse the child. Even after NLT moved out and received a restraining order against CRT, she continued to allow him to visit the family and eventually became pregnant with their third child. After NLT divorced CRT, she continued to let the children spend weeks at a time alone with CRT, despite her knowledge regarding his history of abuse.

[¶ 20] DFS also presented evidence that, after NLT divorced CRT and moved to Thermopolis with MDS, the family's life was still very dysfunctional. The family was receiving services from Early Head Start, and the service providers who assisted the family testified that NLT and MDS were not working on recommended parenting skills and that MDS treated NLT poorly while the

providers were in the home, including threats to kick NLT out of the home. There also came a time when MDS and NLT's young son, CT, were not getting along. MDS told NLT that she needed to send CT to live with CRT or else NLT and her children would have to move out of the home. Instead of moving out with her children, NLT chose to allow CT to live with CRT—a man she and MDS suspected of sexually abusing the child.

[¶ 21] Once the children were taken into protective custody, KAT stated that, not only had she been sexually abused by her father and uncle, she had been sexually abused by MDS. Nonetheless, NLT continued to live with and support MDS. Mother attempted to influence KAT by talking about MDS at her visitations with the children, although she specifically had been told by DFS not to bring him up in conversation. NLT also testified on MDS's behalf at trial, and later admitted to committing perjury at the trial in an attempt to help him.

[¶ 22] NLT has failed to find a safe and appropriate place for her to live with her children, and has not found full-time employment to support her family. Further, her parenting skills never improved, despite assistance from DFS and other agencies. NLT's therapist testified that NLT always put MDS's needs before those of the children, and would continue to put other's needs before her children's in the future. Further, NLT is vulnerable and subject to manipulation by people who are "predatory or unscrupulous." This is particularly concerning because, at the time of trial, NLT was dating a man with a history of domestic violence. The therapist also testified that NLT's everyday functioning level would have to change in order for her adequately to parent her children and that she would always need extraordinary support from others. KAT's therapist testified that KAT will need a greater amount of protection and safety than most children, due to her past victimization. The therapist also expressed that she has concerns about NLT's ability to provide that structure for KAT. Similarly, SAT's speech pathologist testified that she felt placing SAT back into an unstructured environment would be detrimental to the child's progress.

[¶ 23] All of this evidence clearly and convincingly demonstrates that NLT is unfit to have custody and control of KAT, SAT, and JGS. She knowingly and routinely put the children into harm's way at the behest of others. She chose to continue to live with men who were abusive towards her and her children, and actively participated in the sexual abuse of one of the children. She chose to testify on behalf of MDS, who was accused and convicted of sexually abusing her daughter. She cannot provide financially for herself or her children and she has not found an adequate home. She simply does not have the skills required to be an adequate parent.

[¶ 24] NLT does not dispute any of the evidence presented by DFS. Instead, she argues that she can be a fit parent now that she "has aligned herself with professionals and agencies to help her provide [the] structure and services" that her children will need. NLT explains that she is mildly retarded and suffers from epilepsy and that she needs assistance with her children because she was not raised in an environment that encouraged stability. While we are sympathetic to NLT's difficulties, "[I]t would seem unreasonable and not for the best interests of the child[ren] that professional welfare workers should be furnished to care for [these] child[ren] in the parental home on a twenty-four-hour basis for the many years until the child[ren][ ] can be self-sufficient." *MN v. State, Dep't of Family Servs. (In re MN)*, 2003 WY 135, ¶ 27, 78 P.3d 232, 238 (Wyo.2003) (quoting *Matter of C.M.*, 556 P.2d 514, 519 (Wyo.1976)).

We are not unsympathetic to the disabilities and hardships of the parents. However, this case demonstrates a situation in which the best interest of the child and the fundamental rights of the parents diverge. While we zealously guard the fundamental right of parents to care for and associate with their children, we also recognize that a child has the fundamental right to live in an environment free from filth, health hazards, and danger; he also has the right to nourishment, education, and necessary medical attention. *Matter of MLM*, 682 P.2d 982, 990 (Wyo.1984). "When the rights of a parent and the rights of a child

are on a collision course, the rights of the parent must yield." *Id.*

*SD*, 2002 WY 168, ¶ 27, 57 P.3d at 1241. We find that the district court's conclusion that DFS presented clear and convincing evidence that NLT is unfit to have custody and control of KAT, SAT, and JGS was appropriate, and affirm the district court's order terminating NLT's parental rights.

### Termination of MDS's parental rights

[¶ 25] DFS petitioned the district court to terminate MDS's parental rights on three different grounds. The first two grounds are the same as what were alleged against NLT above—Wyo. Stat. Ann. § 14-2-309(a)(iii) and (v). DFS additionally petitioned the district court to terminate MDS's parental rights to JGS upon the grounds found in Wyo. Stat. Ann. § 14-2-309(a)(iv). That subsection requires DFS to show by clear and convincing evidence that MDS is incarcerated due to a felony conviction and that he is unfit to have the custody and control of the child. Wyo. Stat. Ann. § 14-2-309(a)(iv). We find that the record shows clear and convincing evidence that MDS is incarcerated due to a felony conviction and is unfit to have the custody and control of JGS; therefore, we affirm the district court's order terminating MDS's parental rights to the child.

[¶ 26] MDS does not dispute that he currently is incarcerated due to a felony conviction. Therefore, we need only determine whether DFS provided sufficient evidence to show that MDS is unfit to have the custody and control of JGS. The fact that MDS is incarcerated is not *per se* evidence of unfitness. *CDB v. DJE*, 2005 WY 102, ¶ 6, 118 P.3d 439, 441 (Wyo.2005). His "incarceration is, however, a reality that severely impacts the parent-child relationship and therefore cannot be ignored." *Id.* Here, MDS's incarceration will have a severe impact upon his "ability to meet the ongoing physical, mental, and emotional needs of [JGS]." *MSH*, 2012 WY 29, ¶ 8, 271 P.3d at 986 (quoting *R.L.A. v. Dep't of Family Servs. (In re L.A.)*, 2009 WY 109, ¶ 14, 215 P.3d 266, 269 (Wyo.2009)). MDS is currently serving two consecutive sentences of not less than 20 years nor more than 35 years in the Wyoming State Penitentiary. *See Sullivan v. State*, 2011 WY 46, ¶ 8, 247 P.3d 879, 881 (Wyo.2011). JGS will be well into his adulthood before MDS will even be eligible for parole. MDS will not be able appropriately to care for his child's ongoing physical, mental, or emotional needs because he will be in prison for JGS's entire childhood. *See CDB*, 2005 WY 102, ¶ 7, 118 P.3d at 441; *MSH*, 2012 WY 29, ¶ 17, 271 P.3d at 987.

[¶ 27] The reason for MDS's incarceration is also evidence that he is unfit to care for his child. MDS was convicted of sexually assaulting JGS's half-sister, KAT. KAT revealed that MDS had anally raped her on two separate occasions, made her taste his semen, forced her to watch pornography, and that he inappropriately touched her on other occasions. *See Sullivan*, 2011 WY 46, ¶ 3, 247 P.3d at 881. We have recognized that "[t]here can be nothing that makes a parent more intrinsically unfit than abusing his child." *CDB*, 2005 WY 102, ¶ 7, 118 P.3d at 441. MDS claims that this should not be applied in his case, as there were no allegations that he abused his own child; only his child's half-sister. While MDS's assertion may be accurate, we do not believe that distinction weighs in favor of showing he is a fit parent. It shows that he is a convicted sexual offender who preyed upon his child's sibling—a child who was living in the home as part of MDS's and JGS's family. To date, MDS has refused to take responsibility for his criminal actions against KAT. While this behavior may not have been physically directed toward JGS, it nonetheless affects him, and illustrates MDS's "extreme moral delinquency," which "graphically demonstrates that [MDS] is an unfit parent by any standard." *In re Adoption of JLP*, 774 P.2d 624, 632 (Wyo.1989).

[¶ 28] DFS presented clear and convincing evidence that MDS is incarcerated due to a felony conviction and that he is unfit to have custody and control of JGS. JGS will be well into adulthood by the time MDS will become eligible for parole. Due to the length of his incarceration, MDS will not be able to provide for JGS's ongoing physical, mental, or emotional needs during his childhood. Further, MDS committed horrendous

acts against KAT—JGS's half-sister—while they were all living together as a family. We, therefore, affirm the district court's order terminating MDS's parental rights to JGS.

## CONCLUSION

[¶ 29] DFS presented clear and convincing evidence at trial to support the district court's decision to terminate NLT's parental rights to KAT, SAT, and JGS, pursuant to Wyo. Stat. Ann. § 14–2–309(a)(v). The evidence demonstrated that all of the children had been in foster care for 15 of the most recent 22 months, and that NLT continuously put her children in dangerous situations, placed the wants and desires of her ex-husband and boyfriends ahead of the welfare of her children, and cannot meet the basic financial and parental needs of the children. The evidence also showed that NLT would never be able to provide adequate care for her children absent extraordinary help from service providers. DFS also presented clear and convincing evidence to support the district court's decision to terminate MDS's parental rights to JGS, pursuant to Wyo. Stat. Ann. § 14–2–309(a)(iv). MDS is currently serving two consecutive sentences of not less than 20 years nor more than 35 years in prison for sexually abusing KAT. MDS cannot appropriately care for JGS's ongoing physical, mental or emotional needs while he is in prison and will not be eligible for parole until JGS is in his adulthood. Further, the evidence demonstrates that MDS is a sexual offender who suffers from such moral delinquency that he cannot be considered a fit parent. We affirm both of the district court orders terminating NLT's and MDS's rights to KAT, SAT, and JGS.