# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 25

### OCTOBER TERM, A.D. 2014

### February 19, 2015

IN THE MATTER OF THE TERMINATION OF
PARENTAL RIGHTS TO ARW, a minor child:

DRW,

Appellant
(Respondent),

v.                                                                              S-14-0167

DLP and MLP,

Appellees
(Petitioners).

*Appeal from the District Court of Natrona County*
*The Honorable Daniel L. Forgey, Judge*

*Representing Appellant:*
    Scott C. Murray, Attorney at Law, Casper, Wyoming.

*Representing Appellees:*
    John D. Chambers, John D. Chambers, P.C., Casper, Wyoming.

*Guardian Ad Litem:*
    Jacqueline K. Brown, Attorney at Law, Casper, Wyoming.

*Before BURKE, C.J., and HILL, KITE, DAVIS, and FOX, JJ.*

**NOTICE:** This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**BURKE, Chief Justice.**

[¶1]  Appellant, DRW (Father), appeals from the district court's order terminating his parental rights pursuant to Wyo. Stat. Ann. § 14-2-309(a)(iv).  He contends the district court erred in finding that the Indian Child Welfare Act did not apply to the termination proceedings, and that the court erred in denying his request to set aside the entry of default.  He also claims there was insufficient evidence to support the district court's decision.  We affirm.

## ISSUES

[¶2]  Appellant presents the following issues:

> 1.  Whether the district court erroneously concluded the provisions of the Indian Child Welfare Act did not apply to the termination proceedings.
>
> 2.  Whether the district court erred in denying Appellant's *Motion to Set Aside Default & For Leave to File His Answer Out of Time*.
>
> 3.  Whether the district court properly concluded Appellees presented clear and convincing evidence that DRW was unfit to have care and custody of ARW.

Appellees phrase the issues in a similar manner.

## FACTS

[¶3]  Appellant is the father of ARW, born in 2002.  Appellees, DLP and MLP (Adoptive Couple), have been involved in ARW's life since she was three weeks old, when ARW's biological mother began living in Appellees' home.  After Appellant and ARW's mother divorced in 2004, Appellees exercised mother's visitation with ARW under mother's shared custody arrangement with Appellant.  Both Appellant and ARW's mother executed powers of attorney providing that Appellees could have physical custody of ARW.  In August 2012, ARW's mother, who has had very little involvement in ARW's life, consented to termination of her parental rights and to adoption by Appellees.

[¶4]  During ARW's lifetime, Appellant was incarcerated several times for drug-related offenses.  Due to his incarceration, he did not have contact with ARW until she was approximately nine months old.  On multiple occasions, Appellant or his adult children

1

requested that Appellees retrieve ARW from Appellant's home because Appellant was too intoxicated to care for ARW. Appellant consumed alcohol to the point of inebriation almost every day. On two occasions, the Department of Family Services contacted Appellees to take care of ARW due to the condition of Appellant's home. ARW knew what a marijuana pipe was and had learned how to mix Appellant's drinks by the time she was five years old.

[¶5] On March 8, 2012, the mother of one of ARW's friends reported to the police that her daughter had been sexually assaulted by Appellant. After receiving the report, the police went to Appellant's house and found him to be extremely intoxicated. During their interview with Appellant, ARW sat on Appellant's lap and Appellant placed his hand on ARW's breast. The police removed ARW from the home and requested that Appellees take physical custody of ARW. The following day, officers executed a search warrant and found marijuana paraphernalia and items of pornography mixed in with children's books next to Appellant's bed. Appellant was arrested. He was subsequently charged with two counts of sexual abuse of ARW's friend.

[¶6] On July 26, 2012, Appellees were appointed permanent guardians for ARW without Appellant's consent. Appellees enrolled ARW in counseling, and the counselor recommended that Appellant have no contact with ARW. On February 8, 2013, Appellant pled guilty to two counts of sexual abuse of a minor stemming from his contact with ARW's friend.[1] He was sentenced to serve concurrent terms of four to seven years

---

[1] Appellant pled guilty to second degree sexual abuse of a minor under Wyo. Stat. Ann. § 6-2-315(a)(ii) and to third degree sexual abuse of a minor under Wyo. Stat. Ann. § 6-2-316(a)(iv). Those statutes provide as follows:

**§ 6-2-315. Sexual abuse of a minor in the second degree; penalties.**

(a) Except under circumstance constituting sexual abuse of a minor in the first degree as defined by W.S. 6-2-314, an actor commits the crime of sexual abuse of a minor in the second degree if:

. . .

(ii) Being sixteen (16) years of age or older, the actor engages in sexual contact of a victim who is less than thirteen (13) years of age[.]

**§ 6-2-316. Sexual abuse of a minor in the third degree.**

(a) Except under circumstance constituting sexual abuse of a minor in the first or second degree as defined by W.S. 6-2-314 and 6-2-315, an actor

2

on each count.

[¶7]   Appellees initiated this action to terminate Appellant's parental rights on April 8, 2013. The petition alleged that Appellant's parental rights should be terminated pursuant to Wyo. Stat. Ann. § 14-2-309(a)(iv), which provides that parental rights may be terminated if it is shown by clear and convincing evidence that "The parent is incarcerated due to the conviction of a felony and . . . the parent is unfit to have the custody and control of the child." After Appellant failed to file a timely answer to the petition, the clerk of court entered default against him on May 8, and set a hearing for June 18. A week prior to the hearing, the court received a letter from Appellant requesting a continuance. At the hearing, the district court ordered that the matter be continued pending the appointment of a GAL and the completion of a home study. Appellant was subsequently granted court-appointed representation on July 26, and on August 29, he filed his answer and motion to set aside the entry of default.

[¶8]   After a hearing, the district court denied the motion to set aside the default and refused to accept Appellant's answer to Appellees' petition to terminate parental rights. The court determined that Appellant had not demonstrated good cause under W.R.C.P. 55(c) for failing to file his answer in a timely manner.

[¶9]   A hearing on Appellees' petition to terminate parental rights was subsequently held on February 11, 2014. Because default had been entered, Appellant was limited to opening and closing remarks and cross-examination of witnesses. During the hearing, counsel for Appellant informed the court that, according to Appellant, ARW might be an Indian child, stating that ARW's mother was "half Apache." Accordingly, Appellant claimed that he was entitled to the protections, including the notice requirements, of the Indian Child Welfare Act.

[¶10]  Following the hearing, the district court entered an order terminating Appellant's parental rights. The court found that Appellees had proven by clear and convincing evidence Appellant was incarcerated for a felony conviction and that he was unfit to have custody and control of ARW. The court also found that the Indian Child Welfare Act

---

commits the crime of sexual abuse of a minor in the third degree if:

. . .

(iv) Being seventeen (17) years of age or older, the actor knowingly takes immodest, immoral or indecent liberties with a victim who is less than seventeen (17) years of age and the victim is at least four (4) years younger than the actor.

3

was inapplicable. Appellant filed a timely appeal.

## *DISCUSSION*

### I. Application of Indian Child Welfare Act

[¶11] In his first issue, Appellant contends the district court erred in determining that the Indian Child Welfare Act did not apply to the termination proceedings. Ultimately, whether the ICWA applied to the termination proceedings is an issue of statutory interpretation. Statutory interpretation raises questions of law, which we review *de novo*. *Wyoming Dep't of Envtl. Quality v. Wyoming Outdoor Council*, 2012 WY 135, ¶ 8, 286 P.3d 1045, 1048 (Wyo. 2012).

[¶12] According to Appellant, the district court was required to apply the provisions of the Act after his counsel informed the court at the termination hearing that, according to Appellant, ARW's mother was "half Apache" and ARW was therefore an "Indian child" under the terms of the ICWA. Accordingly, Appellant asserts that, pursuant to Sections 1912(a) and (f) of the Act, the court was required to "notify the parent or Indian custodian and the Indian child's tribe . . . of the pending proceedings and their right of intervention," and Appellees were required to demonstrate beyond a reasonable doubt that "continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Appellees respond that, in accordance with the United States Supreme Court's recent decision in *Adoptive Couple v. Baby Girl*, 133 S.Ct. 2552, 2562, 186 L.Ed.2d 729 (2013), because ARW's mother consented to the relinquishment of her parental rights, and because Appellant has not claimed any Native American heritage of his own, the termination of Appellant's parental rights would not precipitate the "breakup of the Indian family" as contemplated by the ICWA. We agree with Appellees.

[¶13] In *Adoptive Couple v. Baby Girl*, 133 S.Ct. at 2558, the biological father, a member of the Cherokee Nation, agreed to relinquish his parental rights to his baby daughter. The birth mother then decided to put the baby up for adoption. *Id.* The morning after the baby was born, the birth mother signed forms relinquishing her parental rights and consenting to an adoption by a non-Indian couple. *Id.* Approximately four months later, the adoptive couple served the biological father with notice of the pending adoption. The father signed papers stating that he accepted service and that he was "not contesting the adoption." The father subsequently requested a stay of the adoption proceedings and asserted that he did not consent to the adoption. *Id.* at 2558-59. After a trial, the South Carolina Family Court determined that the ICWA applied to the proceedings and that the adoptive couple had not carried the heightened burden under §1912(f) of proving that the baby would suffer serious emotional or physical damage if the father had custody. *Id.* at 2559. Accordingly, the Family Court denied the

4

adoptive couple's petition for adoption and awarded custody to the father. *Id.* The South Carolina Supreme Court affirmed the Family Court's decision after determining that the ICWA applied because the case involved a child custody proceeding relating to an Indian child. *Id.* The United States Supreme Court subsequently granted the adoptive couple's petition for a writ of certiorari. *Id.*

[¶14] The U.S. Supreme Court reversed the judgment of the South Carolina Supreme Court. The U.S. Supreme Court determined, first, that the text of the Act demonstrated that it was designed primarily to counteract the unwarranted *removal* of Indian children from Indian families. *Id.* at 2561. In light of this purpose, the Court concluded that when "the adoption of an Indian child is voluntarily and lawfully initiated by a non-Indian parent with sole custodial rights, the ICWA's primary goal of preventing the unwarranted removal of Indian children and the dissolution of Indian families is not implicated." *Id.*

[¶15] The Court further determined that the Act's requirement that remedial services be provided to prevent the breakup of the Indian family did not apply where an Indian family's "breakup" would not be precipitated by the termination of the parent's rights. *Id.* at 2562. The Court held as follows:

> Section 1912(d) provides that "[a]ny party" seeking to terminate parental rights to an Indian child under state law "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed *to prevent the breakup of the Indian family* and that these efforts have proved unsuccessful." (Emphasis added.) The South Carolina Supreme Court found that Biological Father's parental rights could not be terminated because Adoptive Couple had not demonstrated that Biological Father had been provided remedial services in accordance with §1912(d). 398 S. C., at 647-648, 731 S. E. 2d, at 562. We disagree.
>
> Consistent with the statutory text, we hold that §1912(d) applies only in cases where an Indian family's "breakup" would be precipitated by the termination of the parent's rights. The term "breakup" refers in this context to "[t]he discontinuance of a relationship," American Heritage Dictionary 235 (3d ed. 1992), or "an ending as an effective entity." Webster's 273 (defining "breakup" as "a disruption or dissolution into component parts: an ending as an effective entity"). See also Compact OED 1076 (defining "break-up" as, *inter alia*, a "disruption, separation into parts,

5

disintegration"). But when an Indian parent abandons an Indian child prior to birth and that child has never been in the Indian parent's legal or physical custody, there is no "relationship" that would be "discontinu[ed]" — and no "effective entity" that would be "end[ed]" — by the termination of the Indian parent's rights. In such a situation, the "breakup of the Indian family" has long since occurred, and §1912(d) is inapplicable.

Our interpretation of §1912(d) is, like our interpretation of §1912(f), consistent with the explicit congressional purpose of providing certain "standards for the *removal* of Indian children from their families." §1902 (emphasis added); see also, *e.g.*, §1901(4); *Holyfield*, 490 U. S., at 32-34, 109 S. Ct. 1597, 104 L. Ed. 2d 29. In addition, the BIA's Guidelines confirm that remedial services under §1912(d) are intended "to alleviate the need to *remove* the Indian child from his or her parents or Indian custodians," not to facilitate a *transfer* of the child *to* an Indian parent. See 44 Fed. Reg., at 67592 (emphasis added).

*Id.* at 2562-63.

[¶16] We note that Appellant does not provide any discussion of the U.S. Supreme Court's decision in *Adoptive Couple v. Baby Girl*. In any event, however, we would agree with the reasoning of the Supreme Court and conclude that it applies with equal, if not greater, force in the present case. In this case, Appellant has not asserted that he has any Native American heritage that would qualify ARW as an "Indian child" under the ICWA. Rather, he claims that ARW "might be" an "Indian child" because ARW's mother is "half Apache." ARW's mother, however, relinquished her parental responsibilities to Appellees soon after ARW's birth, and she allowed them to exercise her custody and visitation rights after she was divorced from Appellant. Further, ARW's mother consented to termination of her parental rights in the adoption proceedings. Accordingly, as in *Adoptive Couple v. Baby Girl*, the "breakup" of an Indian family would not be precipitated by the termination of Appellant's parental rights. We find no error in the district court's conclusion that the ICWA did not apply to the termination proceedings.

## II.    Motion to Set Aside Default

[¶17] In his second issue, Appellant contends the district court abused its discretion in refusing to set aside the entry of default against him. "Decisions resolving motions for

6

setting aside the entry of default or a default judgment are made in the exercise of sound discretion by the trial court." *Fluor Daniel, Inc. v. Seward*, 956 P.2d 1131, 1134 (Wyo. 1998).

> Rules 55(c) and 60(b), W.R.C.P., are remedial and are intended to promote decisions on the merits when possible. A trial court has wide judicial discretion to grant or deny a defendant's motion under these rules. We will not disturb the exercise of that discretion unless appellant demonstrates that the trial court abused it and was clearly wrong.

*Nowotny v. L & B Contract Indus.*, 933 P.2d 452, 460 (Wyo. 1997) (quoting *Claassen v. Nord*, 756 P.2d 189, 193 (Wyo. 1988)) (internal citations omitted). The proponent of a motion to set aside default has the burden of proving that he is entitled to relief. *Lykins v. Habitat for Humanity, The Heart of Wyo., Inc.*, 2010 WY 118, ¶ 10, 237 P.3d 405, 408 (Wyo. 2010).

[¶18] W.R.C.P. 55(c) provides that "For good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b)." Rule 60(b), in turn, provides in relevant part as follows:

> **Rule 60. Relief from judgment or order.**
>
> . . .
>
> (b) *Other reasons*. — On motion, and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

We have previously held that the factors described in Rule 60(b) are relevant to our

determination of whether the defendant has shown "good cause." *Vanasse v. Ramsay*, 847 P.2d 993, 999 (Wyo. 1993). If the defendant "cannot substantiate reasons under Rule 60(b) for setting aside the default judgment, then 'good cause' also does not exist to set aside the entry of default under Rule 55(c)." *Id.*; *see also M & A Constr. Corp. v. Akzo Nobel Coatings*, 936 P.2d 451, 454-55 (Wyo. 1997).

[¶19] Appellant contends that he provided good cause for relief from the entry of default under W.R.C.P. 55(c) because he was transferred from the Wyoming Medium Correctional Institution in Torrington, Wyoming to the Wyoming Honor Farm in Riverton, Wyoming around the time that the petition to terminate parental rights was filed. In his brief, he claims that "while incarcerated and being transferred to a new facility, [he] did not have possession of the *Petition* and *Summons*, and was therefore unable to respond in a timely manner." We find no evidentiary support for Appellant's argument.

[¶20] In his motion to set aside the default, Appellant provided no indication as to why he had not timely filed his response to the petition to terminate parental rights. At the hearing on his motion, which was not reported, Appellant's counsel apparently contended that Appellant lacked "access" to the petition to terminate parental rights because he had been transferred to another correctional facility. Appellant, however, presented no evidence to support that contention. The record indicates that Appellant was served with copies of the petition and summons on April 12, 2013 at the Wyoming Medium Correctional Institution in Torrington. In light of these facts, the district court concluded as follows:

> [Appellant] has never provided the Court any reason, let alone good cause, for why he did not respond to the petition until well after the default had been entered. Neither the letters [Appellant] wrote to the Court nor his formal motion seeking to set aside the default do so. [Appellant's] counsel contended at the hearing that there may have been – that he may have been transferred to another institution during the relevant time period and not had access to his mail or papers, but there's not much support for that in the record; and, essentially, it would be speculative to make that conclusion based on the record, although certainly counsel was doing her best to represent [Appellant's] interests in this case.
>
> . . .
>
> Based on the record before the Court, Mr. Wilson is entirely culpable for failing to respond to the petition in a timely

manner as previously stated.

We agree with the district court. Ultimately, Appellant presented no evidence to support his contention that he did not have access to the petition when he was transferred to a different correctional facility. Accordingly, we find no abuse of discretion in the district court's determination that Appellant failed to carry his burden of demonstrating his entitlement to relief under Rule 55(c).

## III.  Sufficiency of the Evidence

[¶21]  In his final issue, Appellant claims that Appellees presented insufficient evidence to support the termination of his parental rights.

> We apply traditional principles of evidentiary review when a party challenges the sufficiency of the evidence supporting termination. *R.L.A. v. State Dep't of Family Services (In re L.A.)*, 2009 WY 109, ¶ 12, 215 P.3d 266, 268 (Wyo. 2009). We examine the evidence in the light most favorable to the party prevailing below, assume all favorable evidence to be true, and disregard conflicting evidence presented by the unsuccessful party. *Id.* Because the right to associate with one's family is fundamental, however, we strictly scrutinize petitions to terminate parental rights. *M.L. v. Laramie County Dep't of Family Servs. (In the Interest of L.L.)*, 2007 WY 92, ¶ 9, 159 P.3d 499, 501 (Wyo. 2007). As part of our strict scrutiny standard, we require that a case for termination of parental rights must be established by clear and convincing evidence. *Id.* Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of the contention is highly probable. *Id.*

*ZMETS v. State*, 2012 WY 68, ¶ 8, 276 P.3d 392, 394-95 (Wyo. 2012).

[¶22]  Appellees petitioned to terminate Appellant's parental rights under Wyo. Stat. Ann. § 14-2-309(a)(iv) (LexisNexis 2013). That statute provides as follows:

> **§ 14-2-309. Grounds for termination of parent-child relationship; clear and convincing evidence.**
>
> > (a) The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence:

9

. . .

> (iv) The parent is incarcerated due to the conviction of a felony and a showing that the parent is unfit to have the custody and control of the child[.]

Appellant does not dispute that he was incarcerated for a felony conviction at the time of the termination hearing. Appellant claims that the evidence was insufficient to establish by clear and convincing evidence that he was unfit to have custody and control of ARW. The termination statutes do not define the term "unfit." However, we have previously held that

> [F]itness includes the ability to meet the ongoing physical, mental and emotional needs of the child. Whether a parent is fit to have custody and control of a child is a decision that must be made within the context of a particular case and depends upon the situation and attributes of the specific parent and child.

*AJJ v. State (In re KMJ)*, 2010 WY 142, ¶ 15, 242 P.3d 968, 971 (Wyo. 2010). A parent's fitness is measured at the time of the termination proceedings. That does not mean, however, that the district court must ignore evidence of a parent's previous unfitness. *Id.*, ¶ 17, 242 P.3d at 971.

[¶23] We find ample evidence in the record to support the conclusion that Appellant is not fit to have custody and control of ARW. The fact that Appellant is incarcerated, by itself, is not sufficient to establish unfitness. *NLT v. State (In re KAT)*, 2012 WY 150, ¶ 26, 288 P.3d 1217, 1224 (Wyo. 2012). "[I]ncarceration is, however, a reality that severely impacts the parent-child relationship and therefore cannot be ignored." *Id.* (quoting *CDB v. DJE*, 2005 WY 102, ¶ 6, 118 P.3d 439, 441 (Wyo. 2005)). Ultimately, Appellant's ability to meet ARW's ongoing physical, mental, and emotional needs will be severely restricted during the period in which he is incarcerated. Further, the reason for Appellant's incarceration is also evidence that he is unfit to care for ARW. *NLT*, ¶ 27, 288 P.3d at 1224. Appellant was convicted of two counts of sexual abuse of a minor. While this behavior may not have been physically directed toward ARW, his crimes indicate extreme moral delinquency, and suggest that he is not fit to care for ARW. *Id.* (citing *In re Adoption of JLP*, 774 P.2d 624, 632 (Wyo. 1989)).

[¶24] Additionally, the evidence indicated that Appellant was unable to provide a clean or safe home environment for ARW. While Appellant had custody of ARW, Appellees

10

were called by various parties on numerous occasions to care for ARW due to the condition of Appellant's home and his level of intoxication. During ARW's childhood, Appellant consumed alcohol to the point of inebriation on a daily basis. As a result of exposure to Appellant's alcohol and drug use, ARW knew what a marijuana pipe was and had learned how to mix Appellant's drinks when she was five years old.

[¶25] The evidence also indicated that Appellant took no responsibility for ARW's schooling or medical needs. Appellant did not transport ARW to or from school, did not participate in parent-teacher conferences, and did not plan or pay for extracurricular activities. Appellant also did not schedule, attend, or transport ARW to doctor's appointments with her pediatrician, dentist, optometrist, or primary care physician. Finally, the evidence indicated that Appellant has not respected the recommendation of ARW's counselor that Appellant have no contact with ARW. All of this evidence, in addition to Appellant's convictions for sexual abuse of a minor, indicates that he is unable to meet ARW's ongoing physical, mental, and emotional needs. We conclude that Appellees presented clear and convincing evidence that Appellant is unfit to have custody and control of ARW.

[¶26] Affirmed.