2007 WY 92

In the Interest of L.L., A.L., M.L.,
and N.C.: M.L., Appellant
(Defendant),

v.

Laramie County Department of Family
Services, Appellee (Plaintiff).

No. C–06–8.

Supreme Court of Wyoming.

June 5, 2007.

Representing Appellant: John M. Burman, Faculty Supervisor, and Tina Popova, Student Director, UW Legal Services Program; and Scott A. Homar, Cheyenne, Wyoming.* Argument by Ms. Popova.

* Order Granting Motion Allowing Scott A. Homar to Withdraw as Counsel entered November 16, 2006.

Representing Appellee: Patrick J. Crank, Wyoming Attorney General; Robin Sessions Cooley, Deputy Attorney General; Dan S. Wilde, Senior Assistant Attorney General; and Jill E. Kucera, Senior Assistant Attorney General. Argument by Ms. Kucera.

Before VOIGT, C.J., and GOLDEN, HILL, and KITE, JJ, and SULLINS, D.J.

VOIGT, Chief Justice.

[¶ 1] The district court terminated Mother's parental rights to four of her children after a two-day hearing. Mother now appeals the district court's ruling on two grounds. First, she argues that the district court erred when it allowed the guardian *ad litem* (GAL) from prior adjudications involving her children to testify as a lay witness in the instant proceeding. Second, Mother claims that the Laramie County Department of Family Services (DFS) did not prove that her parental rights should be terminated by clear and convincing evidence. We affirm.

## ISSUES

[¶ 2] 1. Whether the district court erred when it permitted the GAL from previous neglect cases involving Mother and her children to testify at the termination of parental rights hearing, wherein the witness was not appointed as a GAL.

2. Whether clear and convincing evidence existed to justify terminating Mother's parental rights.

## FACTS

[¶ 3] The instant appeal involves Mother's parental rights to four of her children, LL, ML, AL, and NC, ages 11, 9, 5, and 1 at the time DFS filed the petition for termination. ML was taken from Mother and placed in foster care in 2001 as a result of allegations that Mother and ML's father were not properly caring for ML and treating her diabetes. Subsequently, in November 2002, LL, AL, and a fifth child, NL,[1] were taken into protective custody because DFS had concerns about the children's safety and believed them to be neglected. After the children were removed from the home, investigators discovered that the children's father had sexually abused his daughters and the father later pled guilty to those charges.

[¶ 4] Initially after LL, ML, AL, and NL were removed from Mother's care, visitation was conducted with the children by Mother and the children's father· jointly. Joint visitation was subsequently discontinued apparently because the children's father "was trying to manipulate" Mother during those visits. Finally, in June 2003, the juvenile court terminated Mother's visitation with the children after a hearing. Mother has not seen LL, ML, or AL for over three years.

[¶ 5] Mother gave birth to NC on October 22, 2004. Police quickly took NC into protective custody because Mother wanted to remove NC from the hospital against medical advice and also because a drug screen indicated the presence of narcotics in Mother's blood. The drug screening was subsequently proven false; however, NC remained in police custody and Mother has never been allowed to parent the child.

[¶ 6] Mother has been found neglectful of her children in three separate adjudications. First, in 2001, she admitted to neglecting the medical needs of ML. In December 2002, she admitted to charges of abuse and neglect regarding LL, NL, and AL. Finally, the district court found Mother neglectful of NC on March 25, 2005, apparently for attempting to remove the child from the hospital against medical advice. In each of these adjudications John Frentheway acted as the GAL for the children involved.

[¶ 7] The instant case began when DFS filed a petition for the termination of Mother's parental rights to ML, LL, AL, and NC. The district court held a hearing on the petition on April 19 and 20, 2006. At that hearing, DFS elicited testimony from Mr. Frentheway, over Mother's objection, about his involvement with Mother and the children. On May 3, 2006, the district court filed its findings of fact and conclusions of law, in which it ordered that Mother's parental

---

1. Unfortunately, in August 2003, NL drowned in a bathtub while she was in foster care.

rights to LL, ML, AL, and NC be terminated. Mother now appeals that order.

## STANDARD OF REVIEW

[¶ 8]   We have said that

[d]ecisions concerning the admissibility of evidence are within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion, i.e., when the trial court acts outside the bounds of reason or commits an error of law. *Hayes v. State*, 935 P.2d 700, 702 (Wyo.1997); *Wilder v. Cody Country Chamber of Commerce*, 933 P.2d 1098, 1107 (Wyo.1997). The burden is upon the appellant to demonstrate such abuse. *Blake v. State*, 933 P.2d 474, 477 (Wyo. 1997); *Vit v. State*, 909 P.2d 953, 956–57 (Wyo.1996).

*Clark v. Alexander*, 953 P.2d 145, 150 (Wyo. 1998).

[¶ 9]   In cases involving the sufficiency of the evidence to terminate a parent's rights, we have said:

Due to the tension between the fundamental liberty of familial association and the compelling state interest in protecting the welfare of children, application of statutes for termination of parental rights is a matter for strict scrutiny.... As part of this strict scrutiny standard, a case for termination of parental rights must be established by clear and convincing evidence.... Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of the contention is highly probable.... Rigorous though this standard may be, we apply our traditional principles of evidentiary review when a party challenges the sufficiency of the evidence supporting termination.... Thus, we examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party.

*SD v. Carbon County Dep't of Family Servs. (In re SED)*, 2002 WY 168, ¶ 5, 57 P.3d 1235, 1237–38 (Wyo.2002) (quoting *LDC v. Dep't of Family Servs. (In re ZKP)*, 979 P.2d 953, 956 (Wyo.1999)) (internal citations omitted).

## DISCUSSION

### *Whether the district court erred when it allowed Mr. Frentheway to testify.*

[¶ 10]   Mother first argues that Mr. Frentheway acted as a GAL in this case, even though the district court did not appoint him to represent the children. Mother's argument in this regard largely consists of an uncited—but nearly verbatim—recitation of part of our discussion in *DH v. Wyo. Dep't of Family Servs. (In re "H" Children)*, 2003 WY 155, ¶¶ 27–33, 79 P.3d 997, 1004–07 (Wyo.2003), wherein we discussed the evolution of our GAL jurisprudence. The fatal flaw with Mother's argument and reliance on our GAL rules lies in the fact that Mr. Frentheway was not appointed as a GAL in the termination proceeding and his role in the hearing was that of a witness, not an advocate. Mother's argument that Mr. Frentheway's status as GAL in previous proceedings made him a *de facto* GAL in the instant case has no legal or logical foundation.

[¶ 11]   We have previously described the role of a GAL as follows:

A guardian ad litem, counsel, and the court should work together at the beginning of a case to develop and articulate clearly the scope and nature of the guardian ad litem's responsibilities. Full investigations of the facts relevant to custody should be completed by the guardian ad litem, including interviewing witnesses deemed appropriate by the guardian ad litem, custody evaluators, if any, counselors, teachers, relatives, and friends. Based on the evidence, input from any experts, and their own best judgment, the guardians ad litem will develop their recommendations concerning custody. They should communicate with the parents' counsel, preferably in writing, regarding the proposed recommendations sufficiently in advance of trial to allow them to prepare evidence in response to the recommendations. If the parties agree, those recommendations should be provided to the court prior to trial. To fulfill their obligations to the children they represent, guardians ad litem must take the necessary steps to assure sufficient

evidence is presented at trial either by introducing the evidence themselves or assuring counsel for one or both parents are prepared to do so. Finally, guardians ad litem should present their recommendations to the court in the form of closing argument and not through personal testimony. We recognize fully that often guardians ad litem are not handsomely compensated for their work. However, performing these outlined duties is required to fulfill their professional responsibility.

*Pace v. Pace,* 2001 WY 43, ¶ 26, 22 P.3d 861, 870 (Wyo.2001); *see also* U.R.D.C. 106(d). In the instant case, Mr. Frentheway did not have any responsibility to the court other than to testify truthfully. Similarly, he was not required to make a full investigation into the best interests of the children, to present an opinion regarding custody, or to examine witnesses to support any recommendations he may have wished to make to the court. In short, Mr. Frentheway had no responsibility to the court, the children, or Mother greater than that of any other factual witness at a trial. In these circumstances, Mr. Frentheway was neither appointed as GAL, nor are we willing to treat him as such. Our traditional concerns regarding the rules of professional responsibility and the testimony of a GAL are not present in this case because Mr. Frentheway was not both testifying and acting as an advocate for the children. *See Clark v. Alexander,* 953 P.2d at 151–54 (discussing the "hybrid" nature of the attorney/GAL and the modifications to the rules of professional responsibility that come therewith). We, therefore, find no *per se* error in allowing Mr. Frentheway to testify in the instant termination of parental rights action when he acted as GAL to the children in previous neglect actions.

■ [¶ 12] Having determined that it was not error to allow Mr. Frentheway to testify, we now turn to the question of whether the district court erroneously allowed Mr. Frentheway to testify regarding inadmissible opinion evidence. Apart from simply reiterating her arguments regarding Mr. Frentheway's status as GAL, Mother further alleges that Mr. Frentheway offered expert opinions even though he was only admitted as a lay witness at the termination hearing. As support for this argument, Mother identifies two portions of Mr. Frentheway's testimony as objectionable. First, she claims that he inappropriately testified on direct examination that continued visitation with Mother constituted "abuse" for the children. Next, Mother directs us to Mr. Frentheway's statement on cross-examination, wherein he stated that he had received certain information from "the foster parent and from the reports from DFS and from ... the workers that have observed [Mother]."

[¶ 13]  W.R.E. 701 states:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

In contrast, W.R.E. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

[¶ 14]  Mother's counsel objected to Mr. Frentheway's use of the term "abuse" on the grounds that it was an expert opinion on a legal issue. The district court determined that

[t]he word 'abuse' has a number of meanings, and one might be the legal meaning from the statutes. I don't take it that Mr. Frentheway has offered a legal conclusion. In some circumstances a lay opinion may be helpful to the court. I will permit him to offer the opinion, and that's all.

We have recognized that lay witnesses may give opinion evidence regarding matters that are rationally based on their perceptions and helpful to the trier of fact. *Clark v. Gale,* 966 P.2d 431, 437 (Wyo.1998). We also note that while "abuse" is a defined legal term in Wyoming's child protective services statutes, it also has a non-technical, colloquial meaning. *Compare* Wyo. Stat. Ann. § 14–3–

202(a)(ii) (LexisNexis 2005) *with Merriam–Webster's Collegiate Dictionary* 5 (10th ed.1995). We are satisfied from our review of the record that Mr. Frentheway did not testify that visits with Mother were abuse under § 14–3–202(a)(ii), but merely intended to convey his opinion that the intermittent nature of their visits with Mother was causing problems for the children in adjusting to their lives when Mother was not around. It further appears that Mr. Frentheway had firsthand knowledge of this issue because he was part of the DFS team assigned to deal with Mother's ongoing neglect proceedings.[2] Because a central issue in this case, as in all termination cases, was the well-being of the children involved, it is also clear that the emotional and psychological effects of visits with Mother was information that would be helpful to the district court. We, therefore, find no error in the district court's determination that Mr. Frentheway could offer these opinions as a lay witness.

■ [¶ 15] Mother next argues that Mr. Frentheway was precluded from testifying in the instant case "by the Single Matter Doctrine." In our research, we have found no mention of a legal theory known as "the single matter doctrine"; however, without citation to authority, Mother argues that "courts have interpreted the so-called 'single matter' doctrine to mean that guardians *ad litem* have acted outside the scope of the authority granted by their appointments in dependency and neglect cases when they have attempted to act in cases closely tied to the original."

[¶ 16] Mother does direct our attention to 43 C.J.S. *Infants* § 334 (2004), which states that

The rights and powers of a guardian ad litem or next friend usually are restricted to matters connected with the litigation at hand, and such a representative generally has authority, as a representative of the court, to act for the infant in matters such as engaging counsel, filing suit, and prosecuting the litigation.

As discussed hereinabove, Mr. Frentheway was simply testifying as a lay witness and did not participate in the termination proceeding in a representative capacity, nor did he attempt to exercise any authority over the matter. Mother further directs us to *Cabinet for Human Resources v. S.R.J.*, 706 S.W.2d 431 (Ky.Ct.App.1986), *overruled on other grounds by Guffey v. Cann*, 766 S.W.2d 55 (Ky.1989), which she argues is an "example" of the single matter doctrine. In that case, the Court of Appeals of Kentucky merely held that a GAL could not recover expenses incurred in preparation for a future negligence action under a statute providing for GAL payment. *Id.* at 433–34. That court expressly recognized, however, that the GAL could represent the child in the future in a negligence action; however, such representation would not be paid through public funds. *Id.* We think it clear that *S.R.J.* provides no support for Mother's contention that GALs act "outside of the scope of the authority granted by their appointments ... when they have attempted to act in cases closely tied to the original." If anything, we read *S.R.J.* as recognizing the ability of GALs to act in cases closely tied to the original, but they do so without the legal status of a GAL. Therefore, we find that Mr.

---

2. Mother's contention that Mr. Frentheway did not have firsthand knowledge on which to base his opinion is inaccurate. The portion of Mr. Frentheway's testimony upon which Mother relies, in which he testified that he had learned information from DFS, foster parents, and case workers, was offered by Mr. Frentheway in response to a specific line of questioning on cross-examination regarding Mother's "constant hostility" toward DFS after the death of NL and DFS' attempts to reunify her with NC. That testimony was unrelated to his previous lay opinion that continued visitation with Mother was a form of "abuse" for the children. While Mr. Frentheway admitted to relying on out of court statements during the questioning on cross-examination, we

note that Mother's counsel clearly invited him to testify broadly regarding "reunification efforts ... on the part of DFS" and, after Mr. Frentheway testified that he had collected information from third parties, Mother's counsel again asked "what has DFS done that you have seen in an effort to reunify [Mother] with [NC]?" Mother clearly invited a broad answer, failed to object to its potentially hearsay aspects, and in the instant appeal has failed to provide this court with a cogent hearsay analysis. Mr. Frentheway's testimony in this regard also tended to be largely duplicative of testimony already presented to the court through the children's case workers. Therefore, we will not now consider Mr. Frentheway's testimony error.

Frentheway was not prohibited from testifying in the instant case by any "single matter doctrine."

[¶ 17] Mother's final argument regarding Mr. Frentheway's testimony is that unfair prejudice resulted from such testimony. To the extent Mother argues that prejudice resulted from her previous claims of error, as discussed above, we have found that no error occurred in Mr. Frentheway's testimony, therefore there is no possibility that prejudice could result from non-existent errors. Mother also argues that an attorney commits an ethical violation when he or she acts as a GAL and also as a factual witness in the same case. *See Clark v. Alexander,* 953 P.2d at 154. Again, the district court did not appoint Mr. Frentheway to act as GAL in the termination proceedings and he, therefore, did not commit an ethical violation according to *Clark v. Alexander* by testifying as a fact witness in the instant case. Mother further finds error in the fact that Mr. Frentheway based his testimony "on information he had learned outside the termination proceedings" which made such testimony "impossible for [Mother] to refute." We fail to see how our system of justice could continue to operate if witnesses were not allowed to bring information from outside the proceedings to the attention of the finder of fact. The mere fact that Mother was unable to refute Mr. Frentheway's testimony does not constitute error. Finally, Mother has not couched her prejudice argument in terms of prejudicial effect versus probative value under W.R.E. 403, and we will not attempt to create such an argument for her.

**Whether clear and convincing evidence supported the district court's decision to terminate Mother's parental rights.**

[¶ 18] Wyo. Stat. Ann. § 14–2–309 (LexisNexis 2005) governs a district court's ability to terminate a parent's legal relationship with his or her children. In pertinent part, that statute states:

(a) The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence:

. . . .

(iii) The child has been abused or neglected by the parent and reasonable efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent;

. . . .

(v) The child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months, and a showing that the parent is unfit to have custody and control of the child[.]

Wyo. Stat. Ann. § 14–2–309.

[¶ 19] In its findings of fact and conclusions of law, the district court ultimately concluded:

17. Clear and convincing evidence shows that the children were abused or neglected by [Mother], and that the children have been in foster care under the responsibility of the State for the last 15 consecutive months.

18. Clear and convincing evidence shows that the State made reasonable efforts to reunite the family but those efforts were unsuccessful as a result of [Mother's] lack of cooperation, confrontational attitude, inability to focus, inability to properly care for the children even during visitation, personal instability, and dangerous relationships.

19. Clear and convincing evidence shows that the health and safety of the children would be seriously jeopardized if they were returned to [Mother].

20. Clear and convincing evidence shows that [Mother] is unfit to have custody of children because of her limited mental capacity, psychological problems, refusal to address psychological problems, transient lifestyle, dangerous relationships, lack of stability, refusal to cooperate with DFS, and inability to understand or focus on the needs of children.

21. The circumstances listed in conclusion no. 20, above, clearly and convincingly indicate that there is little likelihood of

State services resulting in reunification of [Mother] with these children.

Our task, then, is to determine whether clear and convincing evidence supports these conclusions. Based on our review of the record, such evidence does exist.

[¶ 20] Two elements must be proven by clear and convincing evidence under Wyo. Stat. Ann. § 14–2–309(a)(v) in order to divest parents of their rights to their children. First, it must be shown that a "child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months." *Id.* In the instant case, it is undisputed that all of the children involved in the instant appeal were in foster care provided by the state for the fifteen months preceding the termination hearing. Therefore, the dispositive consideration on this issue is whether DFS proved the second element by clear and convincing evidence; namely, whether Mother is unfit to have custody of the children.[3]

[¶ 21] In the instant case, the evidence that tended to show that Mother was unfit to parent the children was substantial. DFS presented testimony from Robert Fleming, a clinical psychologist who conducted a psychological evaluation on Mother; Rhea Halstead, a DFS case worker who has worked with Mother and some of the children since 2001; Debra Hibbard, a former employee of DFS who was also involved in providing services to Mother and the children; John Frentheway, whose testimony was discussed hereinabove; Shelly Cunningham, the foster parent of NC; and Gwen Smith–Russell, a therapist who had worked with Mother for two and a half years prior to the termination hearing. While we need not belabor the minutia of each witness' testimony, we are satisfied after a review of the record that clear and convincing evidence existed to justify the district court's decision to terminate Mother's parental rights. In accordance with our traditional principles of evidentiary review cited *supra*, we find the evidence tending to show Mother unfit as follows:

- Both while she had custody of her children and later during DFS supervised visitation, Mother displayed an inability to monitor, to make healthy decisions regarding nutrition, or to provide a safe environment for the children.

- Mother had a long-established history of surrounding herself and her children with unsafe individuals, including the children's paternal grandfather who threatened to commit suicide in front of the children, physically abused one of the children, had a history of physical and sexual violence, and was allowed to sleep in the same bed as the female children. Mother declined voluntary services from DFS even after a claim of abuse by the children's grandfather was substantiated. After Mother eventually terminated her relationship with LL, ML, and AL's father—who pled guilty to further sexual abuse of his daughters—she continued to engage in relationships with individuals with substantiated histories of child abuse and other forms of violence. Mother has refused to end such relationships for her children.

- Mother experienced auditory hallucinations and some paranoia that raised concerns about her ability safely to manage her children, but declined to acknowledge the problem or take medications to alleviate it.

- Before ML, AL, and LL were placed in foster care, Mother apparently attempted to commit suicide in front of them.

- The children were upset with and resistant to visitation with Mother.

- Mother was often physically violent and verbally abusive toward DFS workers and other service providers. Mother also became confrontational with NC's foster mother. Such episodes often occurred in front of the children.

- Finally, Mother failed to complete various parts of her case plan and often refused to cooperate with service providers. *See LS v. Johnson County Dep't of*

---

3. We recognized in *C.L. v. Wyo. Dep't of Family Servs. (In re A.D.)*, 2007 WY 23, ¶ 12, 151 P.3d 1102, 1106 (Wyo.2007), that evidence tending to show a parent unfit is also relevant to the consid-eration in Wyo. Stat. Ann. § 14–2–309(a)(iii) regarding whether a child's health and safety would be seriously jeopardized by remaining with or returning to a parent.

*Family Servs. (In re CS)*, 2006 WY 130, ¶ 15, 143 P.3d 918, 923 (Wyo.2006).

[¶ 22] The district court could properly terminate Mother's parental rights under Wyo. Stat. Ann. § 14–2–309(a)(v) because the children were in DFS custody for more than 15 of 22 months preceding the termination hearing and Mother was shown to be unfit to parent. Termination was justified under § 14–2–309(a)(v), therefore we need not discuss whether § 14–2–309(a)(iii) also justified termination. *See BSC v. Natrona County Dep't of Family Servs. (In re CC)*, 2004 WY 167, ¶ 32, 102 P.3d 890, 899 (Wyo.2004).

## CONCLUSION

[¶ 23] The district court did not err in allowing Mr. Frentheway to testify in the instant case and clear and convincing evidence supported the termination of Mother's parental rights to LL, ML, AL, and NC. Affirmed.