2012 WY 165

**In the Matter of the Termination of the Parental Rights to SMH, KDH, MJH, and APH, Minor Children.**

**HMH, a/k/a HM and HB, Appellant (Respondent),**

v.

**State of Wyoming, Department of Family Services, Appellee (Petitioner).**

No. S–12–0094.

Supreme Court of Wyoming.

Dec. 21, 2012.

Representing Appellant: John C. Abraham, Liberty Law Offices, P.C., Gillette, Wyoming.

Representing Appellee: Gregory A. Phillips, Attorney General; Robin Sessions Cooley, Deputy Attorney General; Jill E. Kucera, Senior Assistant Attorney General. Argument by Ms. Kucera.

Guardian Ad Litem: Stacey L. Obrecht and Dan S. Wilde, Wyoming Guardian Ad Litem Program, Cheyenne, Wyoming. Argument by Mr. Wilde.

Before KITE, C.J., and HILL, VOIGT, BURKE, and DAVIS, JJ.

BURKE, Justice.

[¶ 1] Appellant, HMH (Mother), appeals from the district court's order terminating her parental rights pursuant to Wyo. Stat. Ann. §§ 14–2–309(a)(iii) and (a)(v). She contends there was insufficient evidence to support the district court's decision. We affirm.

### ISSUE

[¶ 2] Mother presents the following issue for our consideration: [1]

> Was the district court's finding that parental rights to the minor children should be terminated established by clear and convincing evidence?

The Department of Family Services (DFS) and the children's guardian ad litem state the issue in a substantially similar manner.

---

1. Mother originally presented a second issue challenging the petition for termination of parental rights on the grounds that it was not timely filed. At oral argument, Mother withdrew that issue from the Court's consideration based on our decision in *HJO v. State (In re KMO)*, 2012 WY 99, ¶ 15, 280 P.3d 1203, 1210 (Wyo.2012).

### FACTS

[¶ 3] Appellant is the mother of MJH, born in 1999, SMH, born in 2001, KDH, born in 2003, and APH, born in 2005.[2] After living most of her life in Michigan, Mother relocated with her children in 2007 to Buffalo, Wyoming, where her father resides. While living in Michigan with her children, Mother abused prescription drugs and used heroin on a daily basis. According to Mother, she eventually treated her heroin addiction through methadone therapy and moved to Wyoming with the hope of turning her life around. Following the family's move to Wyoming, however, Mother's substance abuse issues continued. Mother began a relationship with EW, whose behavior had been addressed "religiously" by Buffalo law enforcement for several years prior to Mother's arrival. Approximately one month after meeting EW, Mother and her children moved into an apartment with him. Mother's substance abuse during her habitation with EW eventually led to DFS's involvement in this case.

[¶ 4] DFS initially offered services to Mother in August, 2008, after receiving a report expressing concerns about her drug use. Mother refused this offer of services. Subsequently, in October, 2008, and again in January, 2009, DFS received reports that Mother's children had been locked outside of her home for an extended period, unsupervised, and without proper attire. In response to the January incident, DFS offered parenting services to Mother, which she accepted. At that time, DFS enrolled Mother in parenting classes and provided assistance to Mother in filling out a subsidized housing application, finding employment, and obtaining a driver's license. DFS also initiated counseling services for all four of Mother's children.

[¶ 5] On April 2, 2009, Mother attended a parenting class at the DFS office in Buffalo with her sister. Mother had difficulty staying awake at the class, her speech was slurred, and her movements were slow. Law enforcement was called, and Mother reported to officers of the Buffalo Police Department that she had taken Xanax and methadone pursuant to her prescriptions. After the officers discovered that Mother had recently filled two methadone prescriptions, Mother reported that one of her prescriptions had been stolen while she was out of state. During a subsequent search of Mother's home, however, the officers found the prescription that Mother claimed had been stolen. Mother was placed under arrest for interference with a peace officer, use of a controlled substance, and deception in purchasing prescription medication. At the time of Mother's arrest, EW was serving a jail term as the result of a third conviction for driving while under the influence.

[¶ 6] Upon Mother's arrest, the Buffalo Police Department took her children into protective custody and DFS subsequently placed them in non-relative foster care. At that time, it was discovered that all of the children had significant dental and vision needs that had not been addressed. Each of the children required multiple visits to the dentist to have teeth pulled and to have crowns placed on cavities. Mother's youngest child, APH, required oral surgery for his dental needs. All four of the children required glasses. Additionally, after receiving medical exams, SMH and KDH were diagnosed with attention-deficit hyperactivity disorder and were placed on prescription medications.

[¶ 7] The county attorney filed a neglect petition in juvenile court on April 6, 2009. Mother eventually admitted to the allegations of neglect, stating in a stipulated order that she "failed and was otherwise unable to provide adequate care and supervision of her minor children." The order provided that Mother's children would remain in foster care and would be returned to her after she obtained acceptable housing and completed one month of consecutive drug tests yielding clean results. The order also required that Mother successfully complete an intensive outpatient drug abuse treatment program, that she continue individual counseling, and

---

**2.** The children's father, MHH, is currently incarcerated in Michigan as a result of his conviction for felony sexual assault of a minor. The father did not appear in this action, and his rights are not at issue in this appeal.

that she follow all recommendations for additional services provided by her treatment facility. A DFS caseworker developed a family service plan, echoing the requirements of the stipulated order, and a multi-disciplinary team (MDT) was organized to review the requirements of the plan and make recommendations relating to Mother's rehabilitation and the care of her children. The case plan identified a goal of reunification for Mother and her children.

[¶ 8] While Mother was in jail following her arrest, DFS coordinated a substance abuse evaluation. Pursuant to the recommendation of her substance abuse evaluator, Mother entered an inpatient treatment program in Sheridan upon her release. After only eighteen days in treatment, however, Mother left the inpatient program against staff advice. Her discharge summary from the program recommended successful completion of the inpatient treatment program followed by completion of an intensive outpatient treatment program. Mother enrolled in an outpatient treatment program in June, 2009, but she was subsequently dropped from the program due to her sporadic participation.

[¶ 9] At the beginning of October, despite Mother's failure to complete a substance abuse treatment program, Mother was reunified with her children after she obtained suitable housing and submitted one month of clean drug tests. However, on October 23, both Mother and EW violated probation by testing positive for methamphetamine. Mother and EW were arrested and placed in detention the following day. The children were again removed from Mother's home and, after living with Mother's father for a short period, DFS placed the children in non-relative foster care. During the three weeks that the children were in Mother's home, the children did not attend their individual counseling appointments and did not receive their prescription medications.

[¶ 10] After the children returned to foster care, MJH reported to the family doctor that EW had hit his brothers, and SMH reported that EW had played with his penis. In November, SMH, who was eight years old at the time, was admitted to the Wyoming Behavioral Institute (WBI) for an evaluation and medical assessment. SMH returned to WBI in April, after exhibiting suicidal tendencies. At that time, he received several mental health diagnoses, including major depressive disorder, post-traumatic stress disorder, and oppositional defiant disorder. In May, SMH was placed in residential treatment, where, through weekly therapy sessions, he reported that he had been physically and sexually abused by EW. SMH told his psychologist that he did not want to go home as long as EW was in the house, and that he did not want to go home if his mother was drinking or using drugs.

[¶ 11] MJH, KDH, and APH also manifested symptoms of mental health problems in individual counseling sessions, and all were eventually diagnosed with depression, anxiety, and adjustment disorders by their mental health counselor. Additionally, all of the children expressed fear of EW. When Mother was informed of her children's statements relating physical and sexual abuse by EW, she "adamantly denied" that such abuse had occurred.

[¶ 12] While Mother was in jail following her probation violation, DFS developed a new case plan which required Mother to live her life free of drugs, complete an inpatient substance abuse treatment program, and obtain housing and employment upon her release from jail. The new case plan included a goal of adoption concurrent to the goal of reunification. Mother's visitation with the children continued under the new case plan, and was conducted via phone and jail visits while Mother was incarcerated. During this time, the children began demonstrating signs of anxiety before, during, and after visitation. As a result of his emotional state, APH became incontinent and broke out in hives before and after visitation. Both APH and KDH manifested their anxiety by chewing on their shirts. SMH was given the choice whether to participate in visitation every week due to the stress it induced. In one particularly disturbing episode, after feeling that he had been ignored by Mother during a phone visitation, MJH had a meltdown at school in which he wrote on the bathroom wall with his own feces.

[¶ 13] Upon her release from jail, Mother entered an inpatient treatment program in Casper, which she completed in February. Mother's discharge summary from the treatment program recommended that she complete a community-based outpatient treatment program and that she submit to random urinalysis testing. However, Mother's attendance at the outpatient treatment program was inconsistent, and she missed numerous drug tests in February, March, and April. In the outpatient treatment program, missed drug tests were considered positive tests. Additionally, in March, law enforcement officers responded to a 911 call reporting a domestic dispute between Mother and EW. During the officers' investigation of the incident, which resulted in EW's arrest for public intoxication, Mother admitted that she had been drinking.

[¶ 14] In April, the MDT recommended that the permanency goal be changed from reunification to adoption due to Mother's failure to make sufficient progress in achieving the goals set out in her case plan. Mother's caseworker noted that Mother had not demonstrated a commitment to remaining sober, and that Mother continued to deny and minimize her children's concerns regarding EW. On the same day as the MDT meeting, officers from the Buffalo Police Department responded to an anonymous report of drunk driving. Upon locating the reported vehicle, the officers discovered that Mother was a passenger in the vehicle, and that she was highly intoxicated.

[¶ 15] Ten days later, on May 3, the juvenile court held a hearing to determine the appropriate permanency goal for Mother and her children. The court determined that the goal of reunification should no longer be part of the permanency plan, finding "clear and convincing evidence that it is not in the best interests of the children to return home." The court further concluded that (1) DFS had made reasonable efforts towards family reunification, which had not been successful, (2) that Mother had failed in her rehabilitative efforts, and (3) that the children's health and safety would be seriously jeopardized by returning to Mother's care. The juvenile court changed the permanency goal to termi-

nation of parental rights and adoption of the children.

[¶ 16] In December, DFS filed a petition to terminate Mother's parental rights alleging two separate statutory grounds for termination. First, under Wyo. Stat. Ann. § 14–2–309(a)(iii), DFS asserted that the children had been neglected, that reasonable efforts to rehabilitate the family had been unsuccessful, and that the children's health and safety would be seriously jeopardized by returning to their mother. Second, under Wyo. Stat. Ann. § 14–2–309(a)(v), DFS asserted that the children had been in foster care under the responsibility of the State of Wyoming for fifteen of the most recent twenty-two months, and that Mother was unfit to have custody and control of her children. A three-day bench trial was set for October, 2011.

[¶ 17] Prior to trial, while Mother was pregnant with EW's child, law enforcement responded to another domestic disturbance between Mother and EW. Mother reported that EW, who was highly intoxicated, had shoved her and slapped her in the face. As a result of the incident, EW was arrested and was taken into custody. EW was eventually convicted of domestic battery.

[¶ 18] At trial, the district court received testimony from DFS caseworkers, officers of the Buffalo Police Department, the children's mental health counselors, the children's principal, the children's court-appointed special advocates, Mother's substance abuse and mental health therapists, Mother, Mother's father, and EW. DFS contended that Mother had not made sufficient progress to reunite with her children, and that it should not be required to expend additional time and effort in an attempt to rehabilitate Mother at the cost of further uncertainty as to her children's future. The children's guardian ad litem agreed. Mother, however, claimed that DFS had not made reasonable efforts to rehabilitate her family, and that she had not been given sufficient time to address DFS's concerns with respect to EW. Further, Mother asserted that her ability to care for her new baby without DFS assistance demonstrated that she was fit to care for her four older children. In an order issued January

27, 2012, the court determined that clear and convincing evidence supported termination of Mother's parental rights pursuant to Wyo. Stat. Ann. § 14–2–309(a)(iii) and (a)(v). Mother appeals the district court's order.

### STANDARD OF REVIEW

[¶ 19] Mother contends that DFS presented insufficient evidence to support termination of her parental rights. We recently set forth our standard of review in this context as follows:

> We apply traditional principles of evidentiary review when a party challenges the sufficiency of the evidence supporting termination. *R.L.A. v. State Dep't of Family Services (In re L.A.)*, 2009 WY 109, ¶ 12, 215 P.3d 266, 268 (Wyo.2009). We examine the evidence in the light most favorable to the party prevailing below, assume all favorable evidence to be true, and disregard conflicting evidence presented by the unsuccessful party. *Id.* Because the right to associate with one's family is fundamental, however, we strictly scrutinize petitions to terminate parental rights. *M.L. v. Laramie County Dep't of Family Servs. (In the Interest of L.L.)*, 2007 WY 92, ¶ 9, 159 P.3d 499, 501 (Wyo.2007). As part of our strict scrutiny standard, we require that a case for termination of parental rights must be established by clear and convincing evidence. *Id.* Clear and convincing evidence is that kind of proof that would persuade a trier of fact that the truth of the contention is highly probable. *Id.*

*In re ZMETS*, 2012 WY 68, ¶ 8, 276 P.3d 392, 394–95 (Wyo.2012).

### DISCUSSION

[¶ 20] DFS sought termination of Mother's parental rights under Wyo. Stat. Ann. §§ 14–2–309(a)(iii) and (a)(v) (LexisNexis 2009), which provide as follows:

> § 14–2–309. **Grounds for termination of parent-child relationship; clear and convincing evidence.**
>
> (a) The parent-child legal relationship may be terminated if any one (1) or more of the

following facts is established by clear and convincing evidence:

> . . .
>
> (iii) The child has been abused or neglected by the parent and reasonable efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent;
>
> . . .
>
> (v) The child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months, and a showing that the parent is unfit to have custody and control of the child[.]

Because the statutory bases for termination of parental rights are separate and independent, proof of either of these grounds by clear and convincing evidence provides sufficient justification for termination of parental rights. *ZMETS*, ¶ 18, 276 P.3d at 397; *MDW v. Hot Springs County Dep't of Family Servs. (In re SRJ)*, 2009 WY 94, ¶ 10, 212 P.3d 611, 614 (Wyo.2009).

[¶ 21] We begin our analysis with Wyo. Stat. Ann. § 14–2–309(a)(v), which, as we have previously noted, requires proof of two elements to support termination of parental rights: (1) the children have been in foster care under the State's responsibility for at least fifteen of the most recent twenty-two months; and (2) the Mother is unfit to have custody and control of the children. *ZMETS*, ¶ 18, 276 P.3d at 397. Although the term "unfit" is not defined in the statute, we have stated that

> [F]itness includes the ability to meet the ongoing physical, mental and emotional needs of the child. Whether a parent is fit to have custody and control of a child is a decision that must be made within the context of a particular case and depends upon the situation and attributes of the specific parent and child.

*AJJ v. State (In re KMJ)*, 2010 WY 142, ¶ 15, 242 P.3d 968, 971 (Wyo.2010). Parental fit-

ness is examined at the time of the termination proceedings. Nonetheless, we have noted that "[e]vidence of past behavior is . . . plainly relevant in determining current parental fitness." *R.L.A. v. State Dep't of Family Services (In re L.A.)*, 2009 WY 109, ¶ 17, 215 P.3d 266, 269 (Wyo.2009).

[¶ 22] Mother contends there was not sufficient evidence to terminate her parental rights pursuant to Wyo. Stat. Ann. § 14–2–309(a)(v). She concedes that her children had been in foster care for over fifteen months at the time the petition for termination was filed, satisfying the first element of Wyo. Stat. Ann. § 14–2–309(a)(v). Further, Mother also concedes, in her claim that there was insufficient evidence to support termination of her parental rights under Wyo. Stat. Ann. § 14–2–309(a)(iii), that her children's welfare would be seriously jeopardized if they were returned to her care. Notwithstanding this concession, however, Mother contends that DFS did not present any evidence indicating that she was unfit to have custody and control of the children at the time of trial. We do not agree.

[¶ 23] Initially, we note that, at trial, Mother acknowledged that she would not be capable of caring for her children if they were immediately returned to her. In response to a question asking how Mother would like to proceed to regain custody of her children, Mother stated that "we all should be eased into it." In explanation, Mother stated that she would like to

> Start off with visitation and then maybe even start family counseling all together, you know, all of us: me, [EW], the children, and then start with, like, kind of how we did before, to where the visits were kind of, you know, supervised and then monitored, and then to where they got to come over, even spend a night, you know, or whatever. Something like that.

In closing, Mother's counsel recapitulated her testimony that she was not prepared to take responsibility for the care of her children:

> Your Honor, I guess at the end of the day, nobody is suggesting that if the Court gives an opinion letter two, three weeks down the road and says: "Termination failed," there's nobody suggesting mom's going to drive over and pick up [SMH], mom's going to go gather up her kids and move them into her house and that would be the end of it. . . . I think that's foolishness. Mother herself says: That wouldn't be wise.

We find that Mother's own testimony suggests that she was not able to meet the significant, ongoing needs of her children. Apart from Mother's concessions, however, we find clear and convincing evidence to establish that she is unfit to have custody and control of her children.

[¶ 24] First, we find clear and convincing evidence demonstrating that Mother failed to make sufficient progress in treating her substance abuse problem, which DFS identified as the "primary barrier to achieving a permanency plan of reunification." After her initial failure to complete inpatient or outpatient substance abuse treatment and her subsequent incarceration for methamphetamine use, Mother eventually completed an inpatient treatment program in February, 2010, ten months after her children were initially placed in foster care. With regard to this treatment program, DFS found it "imperative" that Mother successfully follow through with any discharge recommendations. At the MDT meeting held in April, however, it was noted that Mother was not consistently participating in the outpatient program recommended upon her discharge from the inpatient treatment facility. Mother responded to only four of eight random drug tests in March, and missed half of her outpatient treatment meetings in April. Further, although the MDT had recommended that Mother attend weekly AA meetings following her release from the inpatient treatment program, Mother had not attended any AA meetings as of the MDT meeting in March. Despite Mother's sporadic participation in the outpatient treatment program, she reported at the April MDT meeting that she had not consumed alcohol since her release. Her statements, however, were contradicted by a police report generated as a result of EW's arrest for public intoxication on March 30. The police report noted that there "was an apparent altercation between [Mother]

and [EW] over a cell phone" and that, during investigation of the incident, "[Mother] admitted to the deputy that she had been drinking." Additionally, on the same day in April that Mother told the MDT that she "had not drank at all," an officer of the Buffalo Police Department responding to a report of drunk driving found Mother to be "highly intoxicated" in the passenger seat of the reported vehicle.

[¶ 25] At trial, Mother stated that she had achieved sobriety and that she had turned her life around. The district court, however, did not find Mother to be a credible witness:

> There was very little [corroborative] evidence to support Mother's testimony. As often is the case, the Court is placed in a position of determining the credibility of witness testimony concerning not only the testimony itself but also the demeanor and surrounding circumstances in which it was presented. The Court specifically discounted Mother's testimony in this matter.

We defer to the district court's assessment of Mother's credibility. *See DLH v. JLA (In re AMP),* 2012 WY 132, ¶ 20, 286 P.3d 746, 753 (Wyo.2012).

[¶ 26] In addition to Mother's failure to make sufficient progress toward maintaining her life free of drugs and alcohol, the evidence relating to Mother's continued association with EW also demonstrates that she is unfit to have custody and control of her children. After Mother's release from inpatient treatment in February, 2010, she identified the need to refrain from associating with persons who abused alcohol or drugs. Despite this goal, however, Mother would not acknowledge that her continued relationship with EW, whose arrest for public intoxication on March 30 demonstrated his continued problems with substance abuse, was an impediment to her successful rehabilitation. Her caseworker noted that, during a meeting held in March, "When [Mother was] asked specifically about [EW], and how she would support herself and the boys if she did find that [EW] had begun drinking or using drugs, [Mother] would not respond." By the time of the MDT meeting in April, Mother had moved back in with EW.

[¶ 27] More importantly, however, Mother's relationship and cohabitation with EW posed a direct risk of irreparable damage to the children in light of their reports and fears of physical and sexual abuse by EW, as well as Mother's failure to acknowledge these issues. In a quarterly progress report issued in April, DFS summarized the concerns relating to EW as follows:

> [Mother] has been informed of the boys['] concerns about living with [EW], both by professionals and by the boys themselves. She continues to deny any problems or allegations of abuse to the boys by [EW].
>
> The significant barriers to reunification for each of the four boys [are] their expressed fears of [EW], their lack of trust that their mom will be able to live a life without pills, drugs or alcohol, on-going domestic violence, and [Mother's] denial of the abuse allegations against [EW]. While [APH] is not able to verbalize his feelings as clearly as the three older boys, simply due to his young age, all four have made it clear that they are angry with their mom for again using drugs and breaking her promise to them that she would "never ever" do so again. [MJH], [SMH], and [KDH] have also been able to inform their therapist and social workers that they do not want to live with [EW]. [EW] has been [Mother's] live-in boyfriend and the boys are now feeling safe enough to talk about their fear of him due to his being "mean" i.e.: hitting them and yelling at them. The boys have also reported domestic violence in the home between [EW] and [Mother] that they have witnessed.
>
> On January 13, 2010, the Department of Family Services received a report concerning [KDH]. The information provided was that he had previously been hit by [EW] during a time when the boys were in the home with their mom and [EW].... Through separate interviews with all four boys, there were concerns expressed by all of physical and emotional abuse from [EW] and that their mom was in the home when these things did occur. As far as [Mother] being aware of the incidents described by the boys, there were some things they were sure she knew about while others

they didn't know as "she was asleep on the couch and wouldn't wake up." While the concern expressed by the boys covered a longer period of time, it was also apparent that some of the abuse occurred while they were back living with [Mother] and [EW] during the three week period of October 1–23, 2009.... [T]he boys were interviewed separately and all in one evening and their details of events were consistent with each other. Additionally, their observed behaviors and statements of fear of [EW] are [ ] indicators that the abuse did occur. Behaviors observed have been [APH's] incontinence after being informed by his mom during a visit that she was again living with [EW] and [SMH's] refusal to visit his mother for two weeks in a row because he was afraid [EW] would be with her during the visit. Among the incidents described by the boys was that:

> [EW] choked [APH] (more than one time)
>
> [EW] hit [KDH]
>
> [EW] broke a picture across [APH's] back, breaking the glass and cutting [APH]
>
> [EW] walked around the room, hitting the walls with a meat tenderizer and verbally threatening to "kill us"
>
> [EW] threatened to lock [the children] in the basement where there were snakes, spiders and ghosts

In attempts to discuss her sons' allegations and concerns with her, [Mother] states she does not believe any of this happened.

[¶ 28] Further, at trial, DFS presented the testimony of Dr. Kim Faulkner, a child psychologist who had seen SMH in weekly therapy sessions since May, 2010, when SMH entered residential treatment. Dr. Faulkner testified that he had diagnosed SMH with post-traumatic stress disorder, which was likely the result of physical and sexual abuse inflicted by EW. In response to questioning about how he came to that conclusion, Dr. Faulkner testified as follows:

> Counsel: ... [Y]ou indicated that you believe that [SMH] has been physically abused.

Dr. Faulkner: I do.

Counsel: How do you come to that belief?

Dr. Faulkner: He's told me. And he's described being hit, he's described seeing the abuse of his brothers, and he also has some of the classic symptoms of someone who's identified with an aggressor, in that the way he manifests his aggression is the way he's been taught. And he's done it with kicking, hitting, yelling, screaming. He learned those somewhere.

And with an IQ—a full scale IQ of 79, you're not going to sit around and dream it up, it's going to be taught to you.

Counsel: And do you have an understanding as to who his aggressor is?

Dr. Faulkner: I do have an understanding as far as what he's told me.

Counsel: And who is that?

Dr. Faulkner: [EW]. [EW].

Counsel: And you indicated that you believe that [SMH] has been sexually abused.

Dr. Faulkner: I do.

Counsel: And how do you come by that?

Dr. Faulkner: Well, when you're dealing with children that have been traumatized physically, sexually, with neglect, the neglect issue deals with the trust element; you've got to build that. That takes quite a while. And then you let them fulminate, come to you with what they want to talk about in terms of the genetic origins of their abuse, meaning that most children with PTSD, and particularly [SMH], they don't want to think about anything bad; they just want to think about what's good.

So what happens is they come at you with the least difficult trauma to deal with, from among the traumas, okay? That was physical abuse. And we got into that after about a year of therapy.

And once you've dealt with that ... the trust issue is—is cemented well enough that ... they've entered the process of therapy, then as they start trusting you, then in the transference, the issue comes out, they get mad at you and think you're lying to them over something, but then— because they set you up for the physical abuse; but then they come back and they tell you about the sexual abuse.

So they unfold the levels of the onion according to how strong they are to be able to deal with it. And he's just recently revealed that to me in the last maybe two-and-a-half or three months....

Counsel: And who is the aggressor with respect to the sexual abuse?

Dr. Faulkner: [EW].

Dr. Faulkner also testified that Mother's failure to acknowledge SMH's reports of abuse posed a risk of re-traumatization and regression:

Counsel: Do you have an evaluation or do you have an opinion of [Mother's] recognition of the needs and issues of [SMH] for therapy?

Dr. Faulkner: Well, I have a conceptual understanding of it. I have not evaluated her. I do not know what I would come up with with that. I have—all that I've read, the DFS's and the multi-disciplinary team's discussions about it, an opinion, but not a—not one filtered through my way of looking at things.

Counsel: Okay. And what is that conceptual thought that you have?

Dr. Faulkner: Uhm, that she has taken a position wherein she—she doesn't believe that this man has physically or sexually abused the child, any of the children, or [SMH], or that she was neglectful, and that the children are basically lying to her.

Counsel: And what effect would that position have on [SMH]?

Dr. Faulkner: Well, it's in—it's insoluble—it's intolerable in the sense that he can't—he can't—he can't believe it. It's like—it's incredible.

Counsel: Okay. Why is it important—or is it important that a parent be involved in the therapy of their children?

Dr. Faulkner: Well, just for these reasons. And to understand that, you know, if you try to put someone back into an environment with—that came from that and they don't acknowledge what happens, then any little disappointment that occurs is going to be perceived as a betrayal, the original betrayal and re-traumatization. So there has got to be some grounds for what if,

and a discussion of that, at least on a what if basis.

I don't know what happened. I wasn't—I don't know for a fact. I know what [SMH] tells me happened, and I believe him.

Counsel: Did you have an understanding of the fact that [SMH] returned home to his mother at one point?

Dr. Faulkner: I read about the impact of that, and the results of that. And we are—in fact, that's when I was talking about the difference between chronic stress that's a neglect pattern at least to PTSD and an acute traumatization. Putting the person back in the home is an acute traumatization. Living in a neglectful environment for years is a PTSD situation brought about by ongoing chronic stress.

Counsel: Okay. And has [SMH] had both of these things happen to him?

Dr. Faulkner: Yes, he has. Because this—he's regressed now and it's October and that was—that was precisely the time that they tried the re-integration of the family.

Counsel: Okay. Based on your involvement with [SMH], do you have an opinion as to whether the physical and emotional welfare of [SMH] would be placed in jeopardy if he were to be returned to [Mother] today?

Dr. Faulkner: An opinion? I have an opinion.

Counsel: And what is that opinion?

Dr. Faulkner: Well, I think the position, if I understand it, as I think I do, [is] that: "That didn't happen to them," and it did; I think that's an unworkable situation. I don't think that that's going to work. Whether it did or didn't happen, I don't really kind of get into that as much as I do—I know what [SMH] believes and what's happened there.

So putting him back in that environment with no avenue whatsoever for there to be a rectification or a change in that belief system, I think it's unworkable and, therefore, should not be done.

Counsel: Okay. What would be the effect on [SMH] if he were to go back into an unstable environment?

Dr. Faulkner: Well, I think that it will be worse than what it's been since we've had him, since the last time. It's gonna get worse if it happens again, because that's a different level of betrayal and he's kind of starting to trust the healthcare system—or at least the caretaking system.

If you put him back in it, it happens again, he's gonna misperceive even slight disappointments as betrayals; without the proper handling of that, it's going to re-traumatize him and it's going to lead him to say "I need to get out of here." And he knows how to get out of there, because he's shown us how he got out of there, and he's going to up the ante probably about twice as intense.

Counsel: Okay.

Dr. Faulkner: And we're gonna have—we're gonna have a real damaged kid on our hands, is what we'll have.

[¶ 29] In addition to Dr. Faulkner's testimony, the court heard testimony from Rosemont Harriet, a licensed professional counselor who provided individual counseling services to all of the children. Ms. Harriet also stated that Mother's failure to acknowledge her children's reports of abuse posed a risk of regression. She testified that

[Mother] does still live with the same boyfriend [EW] that the children are very afraid of, which leads me to believe that she does not either believe or does not value the opinions of the other boys who have told her that that is an unsafe place for them; that they are afraid of him. So their safety and concern immediately just comes to be an obvious question to me at that time.

Although Mother claims that she was not sufficiently informed that EW's presence in her life was a barrier to reunification, Ms. Harriet testified that she told Mother that "it would really benefit her if she would basically get rid of her boyfriend," and that "multiple people suggested that to her." Ms. Harriet's testimony was supported by the testimony of Mother's caseworker, who stated that "I expressed several times my concern to [Mother] about not believing the boys' reports of abuse [by EW]." When asked why she had supported the recommendation to change the permanency goal away from reunification, Mother's caseworker stated that

[I]n representing the boys and feeling like I was representing their feelings and their wants and needs, uhm, I felt very strongly that they had asked the mother not to reunite with [EW], that they—that they were really concerned about [EW], and that was a topic that kept coming up. And it appeared at all costs that that reunification with [EW] was going to go on, and so I just didn't see where it was in the best interest of the boys at that time.

In her own testimony, Mother acknowledged that after she was released from her inpatient treatment program, DFS workers had communicated that they had a "big issue" with EW. However, she denied that her children had ever told her that they had been mistreated by EW. Mother also stated that she was afraid DFS would "come after" her youngest child because of "[e]verything [DFS has] pulled out of their hats."

[¶ 30] Examining the evidence in the light most favorable to DFS, we find clear and convincing evidence to establish that Mother is unfit to care for her children. The evidence showed that Mother could not possibly meet the mental and emotional needs of her children while refusing to acknowledge that they were afraid of EW and that they did not want to live with him. While we note that Mother's minimization of the children's fears was harmful to the children regardless of whether their allegations of abuse were true, we find that the evidence strongly suggests that the children were, in fact, abused by EW, and that he therefore posed a direct threat to the safety and well-being of Mother's children. Again, however, notwithstanding the veracity of the children's allegations, Mother's refusal to address her children's concerns and her failure to recognize the damage caused by her continued association with EW shows that she is not fit to care for her children. Further, the evidence clearly

indicates that Mother has not been able to maintain sobriety, despite multiple attempts by DFS to help her obtain treatment. Mother's continued drug and alcohol abuse further demonstrates that she is not fit to care for her children. In light of this evidence, we find that termination of parental rights is justified under Wyo. Stat. Ann. § 14–2–309(a)(v). As a result, we need not consider whether termination was also warranted under Wyo. Stat. Ann. § 14–2–309(a)(iii).

[¶ 31] Affirmed.